*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0005P (6th Cir.)
File Name: 01a0005p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

CHARLES KINCAID,
individually and on behalf of
all others similarly situated;
CAPRI COFFER, individually
and on behalf of all others
similarly situated,
　　　　*Plaintiffs-Appellants*,

　　　　　　*v.*

BETTY GIBSON, et al.,
　　　　*Defendants-Appellees*.

No. 98-5385

Appeal from the United States District Court
for the Eastern District of Kentucky at Frankfort.
No. 95-00098—Joseph M. Hood, District Judge.

Argued: May 30, 2000

Decided and Filed: January 5, 2001

Before: MARTIN, Chief Judge; MERRITT, RYAN,
BOGGS, NORRIS, SUHRHEINRICH, SILER,
BATCHELDER, DAUGHTREY, MOORE, COLE, CLAY,
and GILMAN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Winter R. Huff, LAW OFFICES OF JOHN G. PRATHER, Somerset, Kentucky, for Appellants. J. Guthrie True, JOHNSON, JUDY, TRUE & GUARNIERI, Frankfort, Kentucky, for Appellees. **ON BRIEF:** Winter R. Huff, LAW OFFICES OF JOHN G. PRATHER, Somerset, Kentucky, D. Bruce Orwin, Somerset, Kentucky, for Appellants. J. Guthrie True, JOHNSON, JUDY, TRUE & GUARNIERI, Frankfort, Kentucky, for Appellees.

COLE, J., delivered the opinion of the court, in which MARTIN, C. J., MERRITT, SILER, DAUGHTREY, MOORE, CLAY, and GILMAN, JJ., joined. RYAN, J. (p. 30), delivered a separate concurring opinion. BOGGS, J. (pp. 31-32), delivered a separate opinion concurring in part and dissenting in part. NORRIS, J. (p. 33), delivered a separate dissenting opinion, in which SUHRHEINRICH and BATCHELDER, JJ., joined.

_____

## OPINION

_____

R. GUY COLE, JR., Circuit Judge. Plaintiffs-Appellants Charles Kincaid and Capri Coffer appeal the district court's grant of summary judgment upholding Defendants-Appellees' confiscation and ban on distribution of a college yearbook edited by Coffer. Upon en banc review, we determine that the KSU officials violated the First Amendment rights of Kincaid and Coffer. Accordingly, we **REVERSE** the order of the district court and **REMAND** the case with instructions to enter judgment in favor of Kincaid and Coffer and to determine the relief to which they are entitled. *See, e.g., Leila Hosp. and Health Ctr. v. Bowen*, 873 F.2d 132, 134 (6th Cir. 1989).

## I.  BACKGROUND

### A.  *Factual Background*

At the times relevant to this case, both Kincaid and Coffer were registered students at Kentucky State University ("KSU"), a public, state-funded university. Betty Gibson was KSU's Vice President for Student Affairs. KSU funded production and distribution of *The Thorobred*, the student yearbook.[1] KSU students composed and produced *The Thorobred*, with limited advice from the university's student publications advisor, as discussed *infra*.

Coffer served as the editor of the yearbook during the 1993-94 academic year. Although a student-photographer and at least one other student assisted her at one point, Coffer organized and put together the yearbook herself after her staff members lost interest in the project. Coffer endeavored to "do something different" with the yearbook in order to "bring Kentucky State University into the nineties"; she also sought to "present a yearbook to the student population that was what they [had] never seen before." To these ends, Coffer created a purple cover using a material known as "rain shower foil stamp," and, for the first time, gave the yearbook a theme. The theme, "destination unknown," described the atmosphere of "uncertainty" that Coffer believed characterized the time; Coffer found evidence of this uncertainty in students wondering "where are we going in our lives," in high unemployment rates, and in a current controversy regarding

---

[1] Both Kincaid and Coffer assert that they, along with all other KSU students, paid a mandatory eighty-dollar student activity fee at the beginning of the 1993-94 school year which covered the costs of supplying each KSU student with a copy of *The Thorobred*. In her deposition, Gibson stated that the student activity fee did not fund the yearbook, but rather that the yearbook was funded by general revenue. This difference of opinion is not materially related to the dispute at hand. Because the parties agree that the yearbook was funded by the university, and because the university is a state-funded institution, Kincaid and Coffer have First Amendment rights under a forum analysis as detailed *infra*.

whether KSU was going to become a community college. Coffer included pictures in the yearbook depicting events at KSU and in its surrounding community, and political and current events in the nation and world at large. The yearbook covered both the 1992-93 and 1993-94 academic years because the students working on the 1992-93 yearbook had fallen behind schedule. Although the yearbook was originally projected to contain 224 pages, Coffer testified that the final product contained only 128 pages, because she did not have enough pictures to fill 224 pages and because the university administration took no interest in the publication. Coffer completed the yearbook several thousand dollars under budget, and sent the yearbook to the printer in May or June of 1994.

When the yearbook came back from the printer in November 1994, Gibson objected to several aspects of it, finding the publication to be of poor quality and "inappropriate." In particular, Gibson objected to the yearbook's purple cover (KSU's school colors are green and gold), its "destination unknown" theme, the lack of captions under many of the photos, and the inclusion of current events ostensibly unrelated to KSU. After consulting with KSU President Mary Smith and other unnamed university officials, Gibson and Smith decided to confiscate the yearbooks and to withhold them from the KSU community. Gibson contacted Leslie Thomas, KSU's Director of Student Life, and instructed her to secure the yearbooks so that they would not be distributed. Thomas contacted KSU's director for service management, who ensured that the yearbooks were secured. Although Gibson's intention was "perhaps [to] discard [the yearbooks]," Gibson's counsel indicated at oral argument that the yearbooks remain hidden away on KSU's campus.

### B. Procedural Background

In November 1995, Kincaid and Coffer sued Gibson, Smith, and individual members of the KSU Board of Regents under 42 U.S.C. § 1983, alleging that the university's confiscation of and failure to distribute the 1992-94 KSU

———————

### DISSENT

———————

ALAN E. NORRIS, Circuit Judge, dissenting. While I agree with the majority's discussion of the underlying precepts of the First Amendment, I continue to believe that the record supports a conclusion that the university did not create a limited public forum for the reasons outlined in the prior panel's vacated opinion. *Kincaid v. Gibson*, 191 F.3d 719, 728-29 (6th Cir. 1999). Assuming that the *Thorobred* represents a non-public forum, then

> [i]t is no doubt reasonable that KSU should seek to maintain its image to potential students, alumni, and the general public. In light of the undisputedly poor quality of the yearbook, it is also reasonable that KSU might cut its losses by refusing to distribute a university publication that might tarnish, rather than enhance, that image.

*Id.* at 729 (footnote omitted). Although with the benefit of hindsight it might be said that the university could have dealt with this situation more effectively, "regulation of speech in a nonpublic forum need only be reasonable; it need not be the most reasonable or the only reasonable limitation." *Id.* (citing *International Soc'y for Krishna Consciousness v. Lee*, 505 U.S. 672, 683 (1992) (internal quotation marks omitted)).

Accordingly, I respectfully dissent.

Thus, under either *legal* analysis, I believe that factual issues remain, and there should be a trial, rather than our court ordering judgment for the plaintiffs.

student yearbook violated their rights under the First and Fourteenth Amendments to the United States Constitution.[2] Kincaid and Coffer sought damages and injunctive relief.

Both parties moved for summary judgment on the yearbook claim. The district court applied a forum analysis to the students' First Amendment claim, and found that the KSU yearbook was a nonpublic forum. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983). The district court reasoned that Kincaid and Coffer had "put forth no evidence that *The Thorobred* was intended to reach or communicate with anybody but KSU students," and held that "the yearbook was not intended to be a journal of expression and communication in a public forum sense, but instead was intended to be a journal of the 'goings on' in [a] particular year at KSU." Having found that the yearbook was not a public forum, the court held that the university officials' refusal to distribute the yearbook "on the grounds that the yearbook was not of proper quality and did not represent the school a[s] it should," was reasonable. Accordingly, the court granted the KSU officials' motion for summary judgment and denied the students' motion. Both in finding that the KSU yearbook was a nonpublic forum and in finding that the KSU officials' actions were reasonable, the district court relied in part upon *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988).[3]

A divided panel of this court affirmed the district court's opinion. *See Kincaid v. Gibson*, 191 F.3d 719. We granted en banc review to determine whether the panel and the district court erred in applying *Hazelwood* -- a case that deals

---

[2]Kincaid and Coffer raised several other claims, which are not before us on appeal. *See Kincaid v. Gibson*, 191 F.3d 719, 724-25 (6th Cir. 1999), *vacated by* 197 F.3d 828 (6th Cir. 1999).

[3]In *Hazelwood*, the Court held that a newspaper published by a public high school journalism class was a nonpublic forum, 484 U.S. at 270, and that school officials' regulation of the content of the paper was reasonably related to legitimate pedagogical concerns, *id.* at 273.

exclusively with the First Amendment rights of students in a high school setting[4] -- to the university setting, and to examine whether the district court erred in finding that the student-plaintiffs failed as a matter of law to submit sufficient evidence to prove that the KSU yearbook is a limited public forum rather than a nonpublic forum.[5]  For the reasons that follow, we hold that the KSU yearbook is a limited public forum, and that Kincaid and Coffer have presented sufficient evidence that the university officials violated their First Amendment rights to prevail as a matter of law.  *See* Fed. R. Civ. P. 56(c).

## II.  STANDARD OF REVIEW

We review the district court's grant of summary judgment de novo.  *See Greer v. United States*, 207 F.3d 322, 326 (6th Cir. 2000).  Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that

---

[4] *See Hazelwood*, 484 U.S. at 273 n.7 ("We need not now decide whether the same degree of deference is appropriate with respect to school-sponsored expressive activities at the college and university level."); s*ee also Board of Regents of the Univ. of Wisconsin Sys. v. Southworth*, 120 S. Ct. 1346, 1359 n.4 (2000) (Souter, J., concurring in the judgment) ("[our] cases dealing with the right of teaching institutions to limit expressive freedom of students have been confined to high schools, whose students and their school's relation to them are different and at least arguably distinguishable from their counterparts in college education." (citations omitted)).

[5] The parties essentially agree that *Hazelwood* applies only marginally to this case.  Kincaid and Coffer argue that *Hazelwood* is factually inapposite to the case at hand; the KSU officials argue that the district court relied upon *Hazelwood* only for guidance in applying forum analysis to student publications.  Because we find that a forum analysis requires that the yearbook be analyzed as a limited public forum -- rather than a nonpublic forum -- we agree with the parties that *Hazelwood* has little application to this case.  *Cf.  Student Government Ass'n v. Board of Trustees of the Univ. of Massachusetts*, 868 F.2d 473, 480 n.6 (1st Cir. 1989) (stating that *Hazelwood* "is not applicable to college newspapers.").

---

## CONCURRING IN PART, DISSENTING IN PART

---

BOGGS, Circuit Judge, concurring in part and dissenting in part.  From my reading of the record in this case, there is substantial, but not conclusive, evidence that the Kentucky State University administration was displeased with the content of the proposed yearbook.  There is also substantial, but not conclusive, evidence that the yearbook was of poor quality.  Finally, there is substantial evidence on both sides of the question of which of these matters actually motivated the administration.  Under these circumstances, I would reverse for a trial of these genuine issues of material fact.  I therefore concur in the judgment of the court reversing the ruling of the district court, but dissent from our judgment ordering that judgment be entered for the student appellants.

In brief summary, I agree that a student yearbook publication of the type at issue here could be a limited public forum.  But even such a forum can be subject to reasonable time, place and manner rules.  I believe some minimum standards of competence could be a reasonable "manner" restriction.  After all, if the students were to have chosen to have a "yearbook" consisting of a sack of condoms, or 98% white space, or a reproduction of the more obscure portions of "Finnegan's Wake," the court's decision that the administration had relinquished all control over even the form of the material in the yearbook would be much less compelling.  Just where the actual content deficiencies lie on such a scale is, I believe, a disputed issue of material fact.

At the same time, the evidence that the administration's claims are pretextual is also significant.  There was evidence that administrators were disturbed by the viewpoint that they perceived as being expressed.  I am therefore not prepared to say that there may not have been viewpoint discrimination, which would be illegitimate even in a nonpublic form.

_____

## CONCURRENCE

_____

RYAN, Circuit Judge, concurring. In the initial decision of this case by a panel of which I was a member, I concurred in the opinion for affirmance. I thought then, for the reasons expressed in Judge Norris's opinion for the panel, that the plaintiffs had suffered no deprivation of free speech rights under the First Amendment. I now think that in so concluding, I was in error.

I am now persuaded, for the reasons detailed in Judge Cole's excellent opinion for the court, *en banc*, that the district court's judgment in favor of the defendants must be reversed.

the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). There is no dispute regarding the material facts of this case; indeed, each party insists that the facts as presented to the district court require summary judgment in his or her favor. We recognize that "[t]he fact that both parties make motions for summary judgment, and each contends in support of his respective motion that no genuine issue of fact exists, does not require the Court to rule that no fact issue exists." *Begnaud v. White*, 170 F.2d 323, 327 (6th Cir. 1948); *accord Greer*, 207 F.3d at 326. Nonetheless, "'cross motions for summary judgment do authorize the court to assume that there is no evidence which needs to be considered other than that which has been filed by the parties.'" *Greer*, 207 F.3d at 326 (citing *Harrison W. Corp. v. Gulf Oil Co.*, 662 F.2d 690, 692 (10th Cir. 1981)). There is a substantial amount of testimony and documentary evidence in the record before us. Thus, we agree with the parties that the facts as developed in this case are sufficient to decide the case in accordance with clearly established First Amendment law, and we find no material facts in dispute that prevent the district court from granting summary judgment in favor of Kincaid and Coffer.

### III. DISCUSSION

The issue before us is whether the university officials violated the First Amendment rights of Kincaid and Coffer by confiscating and failing to distribute the KSU student yearbook. For the reasons that follow, we apply a forum analysis to the question and hold that the KSU yearbook constitutes a limited (or "designated") public forum. Accordingly, we analyze the actions taken by the university officials with respect to the yearbook under strict scrutiny, and conclude that the officials' confiscation of the yearbooks violated Kincaid's and Coffer's First Amendment rights.

#### A. Application of Public Forum Doctrine

We begin with the fundamental principle that there can be "no doubt that the First Amendment rights of speech and association extend to the campuses of state universities."

*Widmar v. Vincent*, 454 U.S. 263, 268-69 (1981). KSU is a state-funded, public university. *See* KY. REV. STAT. ANN. § 164.290(2). As such, the actions KSU officials take in their official capacities constitute state actions for purposes of First Amendment analysis. Further, the funds and materials that KSU allocates toward production of *The Thorobred* constitute state property. *See United Food & Commercial Workers Union (UFCWU), Local 1099 v. Southwest Ohio Reg'l Transit Auth.*, 163 F.3d 341, 349 (6th Cir. 1998). By confiscating the yearbooks at issue in this case, the KSU officials have restricted access to state property used for expressive purposes. "The Supreme Court has adopted a forum analysis for use in determining whether a state-imposed restriction on access to public property is constitutionally permissible." *Id.* Accordingly, we find that forum analysis is appropriate in this case.

Although Kincaid and Coffer argue their case under the forum doctrine, they argue in the alternative that forum analysis does not apply to the KSU yearbooks because "forum analysis is only appropriate when the issue concerns the access sought by the proposed speaker," and that access is not at issue in this case. Appellants' Supp. Br. at 11-12. We disagree. It is true that "a speaker must seek access to public property or to private property dedicated to public use to evoke First Amendment concerns." *See Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.*, 473 U.S. 788, 801 (1985). Although neither Kincaid nor Coffer seeks to add words or photographs to the yearbook at this point, university officials have cut off KSU students' access to read and possess it. Further, the Supreme Court has often applied a forum analysis to expressive activity within educational settings. *See, e.g., Rosenberger v. Rector and Visitors of Univ. of Virginia*, 515 U.S. 819 (1995) (applying forum analysis to university student activities fund); *Perry*, 460 U.S. 37 (applying forum analysis to school district's internal mail system); *Hazelwood*, 484 U.S. 260 (applying forum analysis to high school newspaper); *Widmar*, 454 U.S. 263 (applying forum analysis to university meeting fora). Thus, we find that

It is the responsibility of the editor to verify the accuracy of all printed matter, and to recognize that he/she will be subject to the legal exigencies that may arise from improper reporting of news.

3.  Set qualifications for and appoint staff members for each publication upon nomination of its editor with concurrence of the Student Publications Advisor, also, remove any of these staff members for cause;

4.  Arrange seminars for student publications personnel with skilled publications experts for discussion of reporting, editing, and other journalistic techniques;

5.  Provide the Thorobred News and Thorobred yearbook staffs with counsel, and encourage them to maintain [sic] for fiscal, news and editorial responsibilities.

In subsidizing the Thorobred News through the Student Publications Board, the University expects the newspaper to maintain at least these two standards of quality control:

1.  Report accurately and fairly newsworthy campus events; and

2.  Pursue important news events to make sure they are reported and commented upon on the editorial pages with comprehension and full understanding of the facts.

Since the Thorobred News is not an "official" organ of the University, the Student Publication[s] Board shall cause to be inserted in the masthead a standing and distinct disclaimer indicating that the views expressed are not necessarily those of the University, but rather are those of the named student author, editor or board of editors. In setting qualifications for the editors of the newspaper and yearbook, the Board shall include a sufficiently high academic average or the successful completion of a basic journalism course, or both. To assure that the newspaper and yearbook is [sic] not overwhelmed by ineptitude and inexperience, the Board shall require the use of an experienced advisor. In order to meet responsible standards of journalism, an advisor may require changes in the form of materials submitted by students, but such changes must deal only with the form or the time and manner of expressions rather than alteration of its content.

forum analysis is the appropriate framework under which to proceed in this case.[6]

### B. Type of Forum

There is no real dispute in this case that the forum in question is *The Thorobred* itself. The parties dispute strenuously, however, the appropriate characterization of *The Thorobred* under forum analysis. Kincaid and Coffer contend that the yearbook is a limited public forum, subject only to reasonable time, place, and manner regulations, and to only those content-based regulations that are narrowly crafted to serve a compelling state interest. *See Perry,* 460 U.S. at 46. The KSU officials respond that the yearbook is a nonpublic forum, subject to all reasonable regulations that preserve the yearbook's purpose. *See id.*

The Supreme Court has recognized three types of fora. The first type is a traditional public forum. A traditional public forum is a place "which by long tradition or by government fiat ha[s] been devoted to assembly and debate," such as a street or park. *See id.* at 45. In traditional public fora, "the rights of the state to limit expressive activity are sharply

---

[6]Our decision to apply the forum doctrine to the student yearbook at issue in this case has no bearing on the question of whether and the extent to which a public university may alter the content of a student newspaper. *See, e.g., Stanley v. Magrath,* 719 F.2d 279 (8th Cir. 1983) (finding violation of students' First Amendment rights to free expression where university cut student newspaper's funding at least in part on the basis that it disapproved of paper's content); *Schiff v. Williams,* 519 F.2d 257, 260 (5th Cir. 1975) (holding that "the right of free speech embodied in the publication of a college student newspaper cannot be controlled except under special circumstances"); *Joyner v. Whiting,* 477 F.2d 456, 460 (4th Cir. 1973) (stating that "if a college has a student newspaper, its publication cannot be suppressed because college officials dislike its editorial comment"); *Antonelli v. Hammond,* 308 F.Supp. 1329 (D. Mass. 1970) (holding that university requirement that all material to be published in student newspaper be previewed by university administrators violated students' rights to free expression). Likewise, we note that a college yearbook with features akin to a university student newspaper might be analyzed under a framework other than the forum framework.

circumscribed": the government may enforce content-based restrictions only if they are narrowly drawn to serve a compelling interest, and may enforce content-neutral time, place, and manner regulations only if they are "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Id.* The second type of forum has been alternatively described as a "limited public forum," *see Rosenberger*, 515 U.S. at 829, and as a "designated public forum," *see Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 679 (1998). The government may open a limited public forum "for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." *Cornelius*, 473 U.S. at 802. Although the government need not retain the open nature of a limited public forum, "as long as it does so it is bound by the same standards as apply in a traditional public forum." *Perry*, 460 U.S. at 46. The third and final type of forum is a nonpublic forum. The government may control access to a nonpublic forum "based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius*, 473 U.S. at 806; *see also Perry*, 460 U.S. at 46.

The parties agree that *The Thorobred* is not a traditional public forum. To determine whether the yearbook is a limited public forum, the touchstone of our analysis is whether the government intended to open the forum at issue. *See Cornelius*, 473 U.S. at 802; *accord Forbes*, 523 U.S. at 677; *Hazelwood*, 484 U.S. at 267. To determine whether the government intended to create a limited public forum, we look to the government's policy and practice with respect to the forum, as well as to the nature of the property at issue and its "compatibility with expressive activity." *Cornelius*, 473 at 802. Further, the context within which the forum is found is relevant to determining whether the government has created a limited public forum. *See, e.g., Forbes*, 523 U.S. at 672-73 (stating that "the public forum doctrine should not be extended in a mechanical way to the very different context of public television broadcasting."); *Cornelius*, 473 U.S. at 802

### Appendix I.

**Student Publications**

The Board of Regents respects the integrity of student publications and the press, and the rights to exist in an atmosphere of free and responsible discussion and of intellectual exploration. The Board expects student editors and faculty advisors to adhere to high standards of journalistic ethics and the highest level of good taste and maturity in the integrity, tone and content of student publications.

**Student Publications Board**

The Thorobred News (Student Newspaper) and the Thorobred yearbook shall be under the management of the Student Publications Board. Though both publications are subsidized by the University, it is the intent that both shall be as free of censorship as prevailing law dictates.

The Student Publications Board membership shall consist of two members of the faculty, one of whom shall serve as chairperson; the editor of the Thorobred News, the editor of the Thorobred Yearbook, two student staff members (other than the editors of the yearbook and the newspaper), and the following exofficio [sic] members -- Vice President for Student Affairs, Director of Student Life, President of Student Government Association, and the Student Publications Advisor. Except for those who are exofficio [sic], all members and the chairperson are appointed by the President of the University for a term of one (1) year. Appointments are made during the spring semester for the succeeding year.

**The Student Publications Board shall:**
1.  Approve the written publications policy of each student publication, including such items as purpose, size, quantity controls, and time, place and manner of distribution;

2.  Set qualifications for and (upon nomination by the Student Publications Advisor), appoint the editor of each publication who shall serve for a one-year term, unless reappointed or removed by the Board for cause;

judgment in favor of Kincaid and Coffer, and to determine the relief to which they are entitled.

(stating that Court will not "ignore the special nature and function of the federal workplace in evaluating the limits that may be imposed on an organization's right to participate" in fundraising forum).  Evaluating these factors -- KSU's policy and practice, the nature of *The Thorobred* and its compatibility with expressive activity, and the context in which the yearbook is found -- we find clear evidence of KSU's intent to make the yearbook a limited public forum.

### *1. Policy*

KSU's written policy toward *The Thorobred* is found in a section of the student handbook entitled "Student Publications."[7]  In addition to stating KSU's policy toward the yearbook, the handbook describes the university's structure for oversight of the publication.  The yearbook (along with the student newspaper) is "under the management of the Student Publications Board."  The Student Publications Board ("SPB"), in turn, is composed of students, faculty members, and university officials.[8]  Both the university's written policy and the structure it created to oversee the

-----

[7]The Student Publications policy, which is reproduced in its entirety at Appendix I of this opinion, also covers the *Thorobred News*, KSU's student newspaper.  The newspaper is not at issue before the en banc panel.

[8]The relevant portion of the Student Handbook states:

The Student Publications Board membership shall consist of two members of the faculty, one of whom shall serve as chairperson; the editor of the Thorobred News, the editor of the Thorobred Yearbook, two student staff members (other than the editors of the yearbook and the newspaper), and the following exofficio [sic] members -- Vice President for Student Affairs, Director of Student Life, President of Student Government Association, and the Student Publications Advisor.  Except for those who are exofficio [sic], all members and the chairperson are appointed by the President of the University for a term of one (1) year. Appointments are made during the spring semester for the succeeding year.

yearbook evidence KSU's intention that the yearbook serve as a limited public forum.

First and foremost, the policy places editorial control of the yearbook in the hands of a student editor or editors. Although the policy provides for the establishment of minimum qualifications for student editors,[9] once a student is appointed editor, editorial control of the yearbook's content belongs to her. This is made clear by the policy's description of the Student Publications Advisor, a university employee. The policy directs that the SPB "shall require the use of an experienced advisor," but limits the advisor's role to "assur[ing] that the . . . yearbook is not overwhelmed by ineptitude and inexperience." Indeed, the policy expressly limits the types of changes that the advisor may make to the yearbook:

> In order to meet the responsible standards of journalism, an advisor may require changes in the form of materials submitted by students, *but such changes must deal only with the form or the time and manner of expressions rather than alteration of content.*

*See* App. I (emphasis added). This language is revealing: not only does it direct the university's chosen advisor to refrain from editing the content of the yearbook, it also tracks the Supreme Court's description of the limitations on government regulation of expressive activity in a limited public forum. *See Perry*, 460 U.S. at 46 ("Reasonable time, place and manner regulations are permissible, and a content-based

---

[9]The handbook states:

The Student Publications Board shall . . . [s]et qualifications for and (upon nomination by the Student Publications Advisor), appoint the editor of each publication who shall serve for a one-year term, unless reappointed or removed by the Board for cause . . . . In setting qualifications for the editors of the newspaper and yearbook, the Board shall include a sufficiently high academic average or the successful completion of a basic journalism course, or both.

violated the First Amendment under a nonpublic forum analysis as well as a limited public forum analysis. *See Rosenberger*, 515 U.S. at 829 ("The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.").

## IV. CONCLUSION

The district court erred by granting summary judgment to the university officials and denying it to Kincaid and Coffer because the record clearly shows KSU's intent to designate *The Thorobred* as a limited public forum. Specifically, the district court erred in concluding that the yearbook was a nonpublic forum on the basis that Kincaid and Coffer "put forth no evidence that *The Thorobred* was intended to reach or communicate with anybody but KSU students." This reasoning simply misapplies well-established public forum law. The district court further erred in concluding that "the yearbook was not intended to be a journal of expression and communication in a public forum sense, but instead to be a journal of the 'goings on' in [a] particular year at KSU." Given KSU's stated policy and practice with regard to the yearbook, the nature of the yearbook and its compatibility with expressive activity, and the university context in which the yearbook is published, there can be no question that *The Thorobred* is a "journal of expression and communication in the public forum sense." The university's confiscation of this journal of expression was arbitrary and unreasonable. As such, it violated Kincaid's and Coffer's First Amendment rights.

In light of the clearly established contours of the public forum doctrine and the substantially developed factual record in this case, the district court should have denied the KSU officials' motion for summary judgment and granted Kincaid's and Coffer's summary judgment motion. Accordingly, we **REVERSE** the judgment of the district court and **REMAND** the case with instructions to enter

contentious theme and pick out its allegedly scandalous cover. Finally, the university released the subsequent (*i.e.,* 1994-95) yearbook, despite the fact that it was, in Gibson's own estimation, only "a tad better than the previous one," *i.e.,* the yearbook at issue in this case.[18] These facts show without doubt that the university's confiscation of the yearbooks was anything but reasonable: rather, it was a rash, arbitrary act, wholly out of proportion to the situation it was allegedly intended to address.

We note that KSU's suppression of the yearbook smacks of viewpoint discrimination as well. The university officials based their confiscation of the yearbook in part upon the particular theme chosen by Coffer, "destination unknown." Coffer characterized that theme, which she described in the yearbook itself, as "my opinion as a student regarding the . . . overall student population." Coffer's choice of theme is a classic illustration of what we mean when we refer to a speaker's "viewpoint." The university officials also based their confiscation of the yearbooks on the fact that the some of its pictures captured particular, well-known individuals whom they deemed to be out of place in a student yearbook. Kincaid summarized the basic premise of First Amendment viewpoint jurisprudence when he testified, "[a] picture that may be relevant to me may be something that would be garbage to you." We might add that in a traditional, limited, or nonpublic forum, state officials may not expunge even "garbage" if it represents a speaker's viewpoint. *See Perry*, 460 U.S. at 46. Finally, the yearbook contained written segments which Coffer described as stating her opinions on various matters. Because the government may not regulate even a nonpublic forum based upon the speaker's viewpoint, *see id.*, and because an editor's choice of theme, selection of particular pictures, and expression of opinions are clear examples of the editor's viewpoint, the KSU officials' actions

---

[18]Cullen also indicated that the 1992-94 yearbook was not materially different in quality from other yearbooks: "the things that were said about the [1992-94] yearbook, this particular book that was confiscated, is [sic] nothing new or unique to any other yearbook. They all have problems."

prohibition must be narrowly drawn to effectuate a compelling state interest."). KSU's intent to limit its own oversight to time, place, and manner aspects of the yearbook is also seen in the policy's treatment of the SPB. The policy declares that one of the duties of the SPB is to "[a]pprove the written publications policy of each student publication, including such items as purpose, size, quantity controls, and time, place and manner of distribution."[10] This language reiterates the university's intent to limit its oversight of the yearbook to general and administrative matters, and to cede authority over the yearbook's content to the students who published it. Finally, the publications policy opens with language that indicates that the expressive activity contained in student publications is to be largely unrestrained: "The Board of Regents respects the integrity of student publications and the press, and the rights to exist in an atmosphere of free and responsible discussion and of intellectual exploration." Such self-imposed restraint is strong evidence of KSU's intent to create a limited public forum, rather than to reserve to itself the right to edit or determine *The Thorobred*'s content.

The KSU officials argue that the handbook policy shows the university's intent to retain, rather than relinquish, control over the yearbook's content. They point in particular to the fact that the policy requires a disclaimer to be placed on the student newspaper -- but not on the yearbook -- as evidence of the university's intent to retain control over the content of the yearbook.[11] Such reasoning relies upon a negative

---

[10]At the time of the events giving rise to the instant case, there was no publications policy written specifically for the yearbook. Although the parties included a draft of such a policy in the Joint Appendix, they agree that the draft has no relevance to this case because it was produced after the events at issue.

[11]The relevant portion of the handbook reads:

Since the Thorobred News is not an "official" organ of the University, the Student Publication[s] Board shall cause to be

inference:  in other words, the fact that the policy fails to require a disclaimer to be placed upon the yearbook purportedly implies that the yearbook *is* "an 'official' organ of the University," because the university requires a disclaimer on the newspaper, and the newspaper is *not* such an official organ.  This is hardly persuasive.  Were we to follow the logic behind this conclusion, we must also conclude that the university has forgone all standards of quality control with relation to the yearbook.  After all, the publications policy states minimum standards of quality control for the newspaper, but none for the yearbook.[12]  Yet to concede that would require the university officials to concede their entire argument -- Gibson argues on appeal that the basis for confiscating the yearbooks is their allegedly "poor quality."  Rather than engage in such inferential gymnastics, we read the university's policy in a straightforward manner.  For the reasons discussed, *supra*, KSU's policy leaves room for only one conclusion:  that the university intended to open the yearbook as a limited public forum.

---

inserted in the masthead a standing and distinct disclaimer indicating that the views expressed are not necessarily those of the University, but rather are those of the named student author, editor or board of editors.

(quotation marks in original).

[12]The handbook states:

In subsidizing the Thorobred News through the Student Publications Board, the University expects the newspaper to maintain at least these two standards of quality control:

1.   Report accurately and fairly newsworthy campus events; and

2.   Pursue important news events to make sure they are reported and commented upon on the editorial pages with comprehension and full understanding of the facts.

year."[16]  The officials then argue that because the yearbook was only 128 pages -- about half its intended length -- and contained pictures that lacked captions, it failed to fulfill its purpose.  Because the yearbook failed to fulfill its intended purpose, the argument goes, the university's confiscation of the yearbooks was reasonable.  The university officials acknowledge, however, that Coffer explained elsewhere in her testimony that the yearbook was intended to be "a collection of pictures that depicted what went on at Kentucky State University, around the community that Kentucky State University set in, the state and the world."  There is no dispute that the yearbook included pictures of a wide range of individuals and events.  Indeed, one of Gibson's main gripes with the yearbook was that it included pictures of current events and celebrities, and "[n]umerous pictures of Ross Perot, Bill Clinton, the Pope, and lots of people."[17]  Thus, the yearbook appears to have fulfilled the purpose expressed by its editor.

More important, the KSU officials' actions were not reasonable because they were arbitrary and conflicted with the university's own stated policy.  The university's publications policy states that "the Thorobred yearbook shall be under the management of the Student Publications Board."  Yet Thomas testified that neither Gibson nor any other KSU administrators discussed with the SPB the drastic act of confiscating the yearbooks.  Further, the university's policy gave to Cullen the power to "require changes in the form of materials submitted by students [that ] . . . deal . . . with the form or the time and manner of expressions."  Yet, the KSU officials never even consulted Cullen, the student publications advisor, before they seized the yearbooks.  In fact, Coffer testified that Cullen had helped her come up with the yearbook's apparently

---

[16]Coffer immediately clarified her statement:  "Well, *the students* provide [the yearbook] through the university."  (emphasis added).

[17]Coffer testified that she included pictures of current events and celebrities because "those were some of the major people and . . . major events that were happening during that time."

should have been, and it wasn't what other people who viewed it thought it should have been." And after the yearbooks came back from the printer, Gibson complained to Cullen that "[s]everal persons have received the book, and are thoroughly disappointed at the quality and content." Thus, it is quite clear that Gibson attempted to regulate the content of *The Thorobred* once it was printed.

The officials' argument also fails because they have, in effect, altered *The Thorobred*. Confiscation ranks with forced government speech as amongst the purest forms of content alteration. There is little if any difference between hiding from public view the words and pictures students use to portray their college experience, and forcing students to publish a state-sponsored script. In either case, the government alters student expression by obliterating it. We will not sanction a reading of the First Amendment that permits government officials to censor expression in a limited public forum in order to coerce speech that pleases the government. The KSU officials present no compelling reason to nullify Coffer's expression or to shield it from Kincaid's view and, accordingly, the officials' actions violate the Constitution. *See Perry*, 460 U.S. at 46.

Even were we to assume, as the KSU officials argue, that the yearbook was a nonpublic forum, confiscation of the yearbook would still violate Kincaid's and Coffer's free speech rights. Although the government may act to preserve a nonpublic forum for its intended purposes, its regulation of speech must nonetheless be reasonable, and it must not attempt to suppress expression based on the speaker's viewpoint. *See Perry*, 460 U.S. at 46. The actions taken by the KSU officials fail under even this relaxed standard.

In arguing that their confiscation of the yearbook was reasonable to preserve the forum's purpose, *see id.*, the officials adopt a portion of Coffer's testimony as a statement of the yearbook's purpose: "It's something that the university provides as a record for that year, a pictorial record for that

## 2. Practice

In addition to examining KSU's stated policy, we must examine the university's actual practice to determine whether it truly intended to create a limited public forum in *The Thorobred*. Indeed, we have noted that "'actual practice speaks louder than words'" in determining whether the government intended to create a limited public forum. *See UFCWU*, 163 F.3d at 353 (quoting *Grace Bible Fellowship, Inc. v. Maine Sch. Admin. Dist. No. 5*, 941 F.2d 45, 47 (1st Cir. 1991)). The record before us contains substantial evidence from varied sources that the SPB followed its stated "hands off" policy in actual practice. Coffer testified without contradiction that Vice President Gibson -- who Coffer described as a "friend[]" with whom she was "on excellent terms" -- "never expressed any concern about what the content might be in the yearbook" prior to its publication, but rather limited her concerns to the yearbook's release date. Nor did the SPB exercise oversight of the yearbook's content. Laura Jo Cullen, the university's publications advisor to the yearbook and an ex officio member of the SPB, testified that the SPB limited its oversight of the yearbook to issues such as advertising rates and selection of editors, and that in the time during which she had been associated with the yearbook,[13] the Board had never attempted to control the content of the yearbook. Leslie Thomas, KSU's Director of Student Life and another member of the SPB, testified that the SPB exercised minimal oversight of the yearbook in actual practice: "We just always dealt with the newspaper so I guess that was the major focus." Thomas also testified that it was the student editor rather than the SPB who determined the content of the yearbook. Thus, the record before us is clear that, in actual practice, student editors -- not KSU officials, not the student publications advisor, and not the SPB -- determined the content of KSU's student yearbook.

---

[13]Cullen's tenure as publications advisor to the yearbook included the entire period at issue in this case (from January 1992 to November 1994). Cullen resigned from KSU in July 1995. *See Cullen v. Gibson*, No. 96-6116, 1997 WL 547932 (6th Cir. Sept. 4, 1997).

### 3. Nature of the Property and Compatibility with Expressive Activity

In addition to the university's policy and practice, an examination of the nature of the forum at issue and its compatibility with expressive activity further indicates that KSU intended to open *The Thorobred* to the student editors as a limited public forum. The KSU yearbook is a student publication that, by its very nature, exists for the purpose of expressive activity. There can be no serious argument about the fact that, in its most basic form, the yearbook serves as a forum in which student editors present pictures, captions, and other written material, and that these materials constitute expression for purposes of the First Amendment. As a creative publication, the yearbook is easily distinguished from other government fora whose natures are not so compatible with free expression. *See, e.g., Cornelius*, 473 U.S. at 805 (finding that nature of government property at issue indicates that fundraising forum in federal workplace is nonpublic forum); *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 134 (1977) (finding that prison is a nonpublic forum); *Greer v. Spock*, 424 U.S. 828, 838 (1976) (holding that military installation is not a public forum). Nor is *The Thorobred* a closely-monitored classroom activity in which an instructor assigns student editors a grade, or in which a university official edits content. *See Hazelwood*, 484 U.S. at 268-69. The student handbook itself describes the yearbook as a "student publication" that should "exist in an atmosphere of free and responsible discussion and of intellectual exploration."[14]   It is difficult to conceive of a forum whose nature is more compatible with expression.

---

[14] The handbook further states that although the yearbook is "subsidized by the University, it is the intent that [it] shall be free of censorship as prevailing law dictates." Although we acknowledge that this freedom from censorship begs the question of what, precisely, prevailing law dictates, we find it hard to fathom that KSU would have included such language in its student publications policy if it contemplated confiscating and withholding distribution of publications with which it disagreed.

campus a newspaper containing indecent speech violated First Amendment because she "was expelled because of the disapproved *content* of the newspaper rather than the time, place, or manner of its distribution." (italics in original; footnote omitted)). Nor is it a narrowly crafted regulation designed to preserve a compelling state interest. *See Perry*, 460 U.S. at 46. Rather, wholesale confiscation of printed materials which the state feels reflect poorly on its institutions is as broadly sweeping a regulation as the state might muster. Further, the university officials' action leaves open no alternative grounds for similar expressive activity. *See id.* at 45. The record contains no other student forum for recording words and pictures to reflect the experience of KSU students during the 1992 through 1994 school years. Indeed, the likelihood of the existence of any such alternative forum at this late date, when virtually all of the students who were at KSU in the early 1990s will have surely moved on, is extraordinarily slim. Accordingly, the KSU officials' confiscation of the yearbooks violates the First Amendment, and the university has no constitutionally valid reason to withhold distribution of the 1992-94 *Thorobred* from KSU students from that era.

The KSU officials argue that withholding the yearbooks is excusable because they were regulating the style and form of the yearbooks rather than their content. At oral argument, counsel for the officials argued that the record contains *no* evidence that the officials withheld distribution of the yearbooks based on content, or that they altered the content of the yearbooks. This argument is simply not credible. First, the record makes clear that Gibson sought to regulate the content of the 1992-94 yearbook: in addition to complaining about the yearbook's color, lack of captions, and overall quality, Gibson withheld the yearbooks because she found the yearbook theme of "destination unknown" inappropriate. Gibson also disapproved of the inclusion of pictures of current events, and testified that "[t]here were a lot of pictures in the back of the book that . . . to me, looked like a *Life* magazine." Gibson further stated that the inclusion of pictures of current events "was not exactly what I thought it

In sum, our review of KSU's policy and practice with regard to *The Thorobred*, the nature of the yearbook and its compatibility with expressive activity, and the university context in which the yearbook is created and distributed, all provide strong evidence of the university's intent to designate the yearbook as a limited public forum. Accordingly, we must determine whether the university officials' actions with respect to the yearbook were constitutional.

### C.  Constitutionality of University Officials' Actions

As discussed, *supra*, the government may impose only reasonable time, place, and manner regulations, and content-based regulations that are narrowly drawn to effectuate a compelling state interest, on expressive activity in a limited public forum. *See Perry*, 460 U.S. at 46. In addition, as with all manner of fora, the government may not suppress expression on the basis that state officials oppose a speaker's view. *See id.* For the following reasons, we hold that the actions taken by the KSU officials ran afoul of these restrictions on government action.

Upon their return from the printer, the 1992-94 yearbooks were delivered to the office of Laura Cullen, the student publications advisor. Before they could be distributed to Kincaid and other KSU students, Gibson ordered Leslie Thomas to have them secured; Thomas complied, and, without any notification or explanation to Cullen, the yearbooks were spirited away. To this day -- nearly six years after the yearbooks returned from the printer -- the university refuses to distribute them. This is not a reasonable time, place, or manner regulation of expressive activity. *See Perry*, 460 U.S. at 46; *see also Papish v. Board of Curators of the Univ. of Missouri*, 410 U.S. 667, 670 (1973) (holding that university's expulsion of graduate student for distributing on

---

speech.  *See Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1975) ("[W]here a speaker exists . . . the protection afforded is to the communication, to its source and to its recipients both." (footnote omitted)).

---

### 4.  Context

We are also persuaded that the context within which this case arises indicates that *The Thorobred* constitutes a limited public forum. The university is a special place for purposes of First Amendment jurisprudence. The danger of "chilling . . . individual thought and expression . . . is especially real in the University setting, where the State acts against a background and tradition of thought and experiment that is at the center of our intellectual and philosophic tradition." *Rosenberger*, 515 U.S. at 835-36 (citing cases); *see also Widmar*, 454 U.S. at 267 n.5 ("This Court has recognized that the campus of a public university, at least for its students, possesses many of the characteristics of a public forum."). The university environment is the quintessential "marketplace of ideas," which merits full, or indeed heightened, First Amendment protection. *See Healy v. James*, 408 U.S. 169, 180 (1972) (stating that the "vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools" (quotation marks and citation omitted)). In addition to the nature of the university setting, we find it relevant that the editors of *The Thorobred* and its readers are likely to be young adults -- Kincaid himself was thirty-seven at the time of his March 1997 deposition. Thus, there can be no justification for suppressing the yearbook on the grounds that it might be "unsuitable for immature audiences." *Compare Hazelwood*, 484 U.S. at 271 (footnote omitted), *with Widmar*, 454 U.S. at 274 n.14 ("University students are, of course, young adults. They are less impressionable than younger students . . . ."). Accordingly, we find that the fact that the forum at issue arises in the university context mitigates in favor of finding that the yearbook is a limited public forum.

### 5.  KSU Officials' Arguments

The KSU officials dispute this substantial evidence of the university's intent to create a limited public forum in the student yearbook. They argue that a limited public forum cannot exist unless the government has opened the forum at

issue for "indiscriminate use by the general public." The district court agreed, concluding that the yearbook was a nonpublic forum by reasoning that Kincaid and Coffer had "put forth no evidence that *The Thorobred* was intended to reach or communicate with anybody but KSU students." This reasoning badly distorts a basic tenet of public forum law. It is true that *one of* the ways in which the government may create or designate a public forum is by opening the forum "for indiscriminate use by the general public." *See Perry*, 460 U.S. at 47. But the government may create a limited public forum in other ways as well: "a public forum may be created by government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, *or* for the discussion of certain subjects." *Cornelius*, 473 U.S. at 802 (emphasis added); *see also Hazelwood*, 484 U.S. at 267 ("[High] school facilities may be deemed to be public forums only if school authorities have 'by policy or by practice' opened the facilities 'for indiscriminate use by the general public,' *or* by some segment of the public, *such as student organizations*." (citations omitted and emphasis added)). Thus, the proposition put forth by the university officials and relied upon by the district court -- *i.e.,* that the government must open a forum for indiscriminate use by the general public in order to create a designated public forum -- is erroneous.

The KSU officials further argue that only select individuals had access to *The Thorobred*, and that "[a] designated public forum is not created when the government allows selective access for individual speakers rather than general access for a class of speakers." *See Forbes*, 523 U.S. at 679. In an attempt to bring *The Thorobred* under this rule, the officials point out that KSU limited access to the yearbook to the yearbook staff, which, in this case, was comprised of only Coffer. The officials note additionally that KSU's student handbook imposes certain minimum requirements -- such as a minimum grade point average or successful completion of a journalism course -- upon members of the yearbook's board of editors, and that there is no evidence that the student body as a whole may contribute to the yearbook. The KSU

officials again misinterpret First Amendment forum law. There is a "distinction between 'general access,' which indicates that the property is a designated public forum, and 'selective access,' which indicates that the property is a nonpublic forum." *Forbes*, 523 U.S. at 679 (citations omitted). General access is defined as the situation in which the government "makes its property generally available *to a certain class of speakers*." *Id.* (emphasis added). Selective access occurs when the government "does no more than reserve eligibility for access to the forum to a particular class of speakers, *whose members must then, as individuals, 'obtain permission' to use it*." *Id.* (emphasis added and citation omitted). In the instant case, KSU's policy and practice indicate that the university intended to designate the yearbook as a public forum for those students who became editors of the yearbook -- in other words, the student editors composed the "class of speakers" for which the university designated the yearbook as a limited public forum. These editors were under no obligation to "obtain permission" each time they sought to access the yearbook -- indeed, the policy and practice of the university was to give the student editors exclusive control over the content of *The Thorobred*. Thus, the student editors had "general access" to the yearbook. *See Forbes*, 523 U.S. at 679. This is consistent with our finding that the yearbook constitutes a limited public forum for that particular class.[15]

---

[15]We note that the class in this case turned out to include at most three students -- Coffer and the two yearbook staff members who briefly assisted her -- and perhaps includes as few as one (Coffer). The small number of students who ended up working on the yearbook has no bearing on our finding that the yearbook constitutes a limited public forum. Our focus is on whether the university intended to create a limited public forum in the yearbook. The particular events in this case -- including the facts that a small number of students joined the yearbook staff and that two students left it -- transpired long after the university expressed its intent to create a limited public forum for the student yearbook editors, whomever they might turn out to be. We further note that although Kincaid is not part of the class of student speakers who worked on the yearbook, the First Amendment protects his right to read *The Thorobred* once the university has opened it up as a forum for