Darcie DRAUDT, et. al., Plaintiffs,

v.

WOOSTER CITY SCHOOL DISTRICT
BOARD OF EDUCATION, et. al.,
Defendants.

No. 5:03–CV–62.

United States District Court,
N.D. Ohio,
Eastern Division.

Feb. 14, 2003.

Kenneth D. Myers, Cleveland, OH, for Plaintiffs.

Eric J. Johnson, David J. Millstone and Jeffrey J. Wedel, Squire, Sanders & Dempsey, Krista K. Keim and David Kane Smith, Britton Smith Peters & Kalail, Cleveland, OH, for Defendants.

## ORDER

GWIN, District Judge.

On January 15, 2003, Plaintiffs Darcie Draudt, Vasanth Ananth, Tim Yaczo, and Kendra Oyer (collectively "the Students" or "the Plaintiffs") moved the Court for a preliminary injunction. With their motion, the Students seek an order enjoining the Defendants Wooster City School District Board of Education ("the Board" or "the District") and David Estrop (collectively "the Defendants") from conducting any prior review or censorship of the Wooster Blade ("the Blade") student newspaper during the pendency of the Students' First Amendment suit against the Defendants. The Defendants oppose the motion.

On February 4, 2003, this Court conducted a hearing upon the Students' motion for a preliminary injunction. For the reasons that follow, the Court denies the Plaintiffs' motion for a preliminary injunction.

### I. Background

On January 9, 2003, the Students sued the Defendants alleging that the Defendants violated their First Amendment rights to free press and free speech. The Plaintiffs attend Wooster High School and are editors of the Blade, a bi-weekly student newspaper. The underlying suit stems from the Wooster High School principal's seizure of the entire press run of the December 20, 2002, issue of the Blade. The principal impounded the paper because the District believed it contained a potentially defamatory article.

On January 9, 2003, beyond filing their First Amendment suit, the Plaintiffs also moved the Court for a temporary restraining order, seeking the immediate release of the newspaper for distribution. Judge

Nugent[1] denied the request for the temporary restraining order stating that he lacked sufficient factual information. Instead, Judge Nugent filed a stipulated judgment in which the parties agreed to distribute the December 20, 2002, issue of the Blade with minor modifications. The modifications consisted of the removal of the two objectionable sentences in the issue's article about the Board's underage drinking policy.

On January 15, 2003, the District distributed the modified Blade issue.

### December 20, 2002 Blade Issue

The December 20, 2002, Blade issue contained an article about the Board's underage drinking policy that alleged that the Board violated the policy by giving preferential treatment to athletes it had caught drinking. In the article, the Blade quoted two students by name and stated that one student, a female Wooster high school student, admitted to drinking at a party. The article further stated that the Board intended to punish the female student. Specifically, the article stated, " 'I knew this was going to get busted—kids from Triway, Cambridge, and Norwayne were there,' attendee [student name omitted] said. [Student name omitted], also openly admits to consuming alcohol at the event and, like the five other violators, will receive community service as punishment."[2]

The Blade's faculty advisor approved the publication of the article and the District printed its customary 4,500 copies of the edition. The District scheduled the issue's distribution for December 20, 2002, the last school day before the holiday break. The Wooster high school principal and the District superintendent, however, believed that the article was potentially defamatory to the female student quoted in the underage drinking article. According to the principal and the superintendent, the young woman had previously denied to her parents and school officials that she had been drinking and therefore, the Board had not disciplined her for underage drinking. Consequently, on December 19, 2002, the superintendent ordered the principal to seize the entire press run of the paper and stop distribution.

On December 23, 2002, the Board issued the following statement:

> The Wooster Blade, the district student newspaper, printed a story in the latest edition that referred to two students by name and state [sic] that one of the students "... openly admits to consuming alcohol at the event and, like the five other violators, will receive community service as punishment." The article mentioned elsewhere that "the school ... punished and convicted six ... students of drinking."
>
> *These statements are entirely untrue and factually inaccurate. They are potentially defamatory or libelous and may constitute a violation of law.*
>
> As a result of the foregoing, the Administration impounded the Wooster Blade.

(Emphasis added).

### Operation of The Blade

The Blade is a school-sponsored student newspaper that the District circulates both within the school and the community. Of the 4,500 copies produced per issue, the Board distributes approximately 1,400 within the school and 3,100 throughout the community. The content of the paper consists of news articles, arts coverage, sports

---

**1.** Judge Nugent substituted for this Court in hearing the motion for a temporary restraining order.

**2.** The original Blade article contained the names of the students. The Court, however, omits the names.

news, opinions, editorials, and advertisements.

Students enrolled in Wooster's high school journalism class contribute most of the articles but the Blade also publishes outside submissions. These outside submissions are limited to guest columns and letters to the editor. The journalism students participating in the publication of the Blade receive both grades and credits. A regular Wooster High School faculty member teaches the journalism class and oversees the publication of the Blade. Until the December 20, 2002, issue, the principal had never reviewed the paper before publication. Outside contributions and advertisements fund Blade expenses although the Board pays the faculty advisor.

### Board Policy Concerning School–Sponsored & Student Publications

In their First Amendment suit, the Students claim that the Board violated its policy against prior review of student publications. Policies 5721, 5721.01, and 5722 of the Wooster City School District Bylaws and Policies govern the operation of school-sponsored and student publications. Policy 5721 governs student-sponsored publications including "newspapers." It expressly gives the District the right to prohibit the distribution of certain publications. Specifically, it provides:

> The Board of Education respects the right of students to express themselves and to distribute materials as a part of that expression, but recognizes that the exercise of that right must be limited by the responsibility to maintain an orderly school environment and to protect the rights of all members of the school community.
>
> For purposes of this policy, "publications" shall include any printed, audio or visual or printed cards, letters, circulars, books, pamphlets, notices, banners, *newspapers,* yearbooks, wearing apparel, or other like materials.
>
> *The Board reserves the right to designate and prohibit the distribution of publications which are not protected by the right of free expression because they violate the rights of others.* Such unprotected materials are those which ... *libel any specific person or persons.*
>
> \*    \*    \*    \*    \*    \*
>
> *The Board reserves the right to halt the distribution of unprotected materials.*

(Emphasis added).

Board Policy 5721.01 governs student publication rights and states:

> The Wooster City School Board recognizes that an unfettered student press is essential in establishing and maintaining an atmosphere of open discussion, intellectual exchange, and freedom of expression on campus.
>
> It is, therefore, the policy of the District that student journalists shall be afforded protection against prior review (per Hazelwood) and/or censorship.
>
> *Such freedom does not extend to ... material that [is] ... obscene as to minors, defamatory, including libel and slander, materially and substantially disruptive of school activities.*

(Emphasis added).

As to the students' rights and duties concerning student publications, Policy 5721.01 states:

> Students who work on official student publications will:
>
> \*    \*    \*    \*    \*    \*
>
> b.   check and verify the accuracy of all facts and quotations;
>
> c.   provide space in the same issue of the newspaper, when feasible, for rebuttal and opinions in case of news articles,

editorials, or letters to the editor concerning controversial issues;

d. *determine the content of the student publication/media so as not to publish any defamatory material or material which is obscene as to minors or which would cause a substantial disruption of school activities; all other content is considered appropriate and shall not be censored;*

e. consult with legal resources, local and national, in any case where the legality of content is questioned provided, however, that resolutions of disputes will rest with the adviser.

(Emphasis added).

The Board policy states the advisor's role as follows:

Advisers to official school publications will:

a. serve primarily as teachers whose chief responsibility is guiding students to an understanding of the nature, function, and ethics of a free press and of student publications, not acting as censors. *Also, ensure that publications are free of any defamatory material or material which is obscene as to minors or which would cause a substantial disruption of school activities.*

b. encourage the staff toward editing an intelligent publication that presents a complete and unbiased report and that reflects accurate reporting and editorial opinion based upon facts.

c. function as liaison between officials and students to ensure full communication of administrative guidelines to:

(1) students—advising of their right to print without censorship or prior administrator review

(2) school officials—advising that it is the duty of the institution to allow full and vigorous freedom of expression.

\*    \*    \*    \*    \*    \*

e. consult with legal and/or other resources about the legality of content.

(Emphasis added).

Under Policy 5721.01, the role of school administrators is stated as:

School administrators will:

\*    \*    \*    \*    \*    \*

b. be aware of the most current court rulings as they relate to free expression;

c. support the First Amendment rights of students and the efforts of publications/media advisers to guarantee those rights in their daily work with publications/media; communicate to other members of the school community the rights of student journalists to question, inquire, and express themselves through student publications/media;

d. *exercise no prior review;*

e. not terminate, transfer, or remove a person from his/her advisership for failure to exercise editorial control over student publications/media or otherwise suppress rights of free expression of student journalists;

(Emphasis added).

Policy 5721.01 also contains a clause reserving the Board's right to depart from its agreement not to censor or exercise prior review over student publications if its publication procedures are not followed. Specifically, the provision states:

In adopting this policy of affirming the First Amendment rights of student journalists, the Board of Education agrees to the practice of unrestricted publications regarding censorship and/or interference as per freedom of expression *as long as such publications adhere to the established conditions and practices within this document.*

(Emphasis added).

Finally, Policy 5722, governing school-sponsored publications, places further lim-

its on students' free speech rights. It states that, "[m]aterials which violate or may violate the rights of others may not be published." A listing of such material is given in the Board's policy for "Student Sponsored Publications."

## II. Standard & Analysis

### A. Standard

Whether to grant injunctive relief is within the sound discretion of the trial court. *Mason County Med. Assoc. v. Knebel*, 563 F.2d 256, 261 (6th Cir.1977); *Deck v. City of Toledo*, 29 F.Supp.2d 431, 432 (N.D.Ohio 1998) (citing *Virginia Ry. Co. v. Sys. Fed'n, R.E.D.*, 300 U.S. 515, 551, 57 S.Ct. 592, 81 L.Ed. 789 (1937)). The party seeking the injunction must establish its case by clear and convincing evidence. *Garlock, Inc. v. United Seal, Inc.*, 404 F.2d 256, 257 (6th Cir.1968); *Deck*, 29 F.Supp.2d at 433 (N.D.Ohio 1998); *Vanguard Transp. Sys., Inc. v. Edwards Transfer & Storage Co.*, 109 Ohio App.3d 786, 792–93, 673 N.E.2d 182, 186 (1996). To meet this burden, the plaintiff's evidence must more than outweigh the evidence opposed to it. The plaintiff's evidence must persuade the court that its claims are highly probable, *Colorado v. New Mexico*, 467 U.S. 310, 316, 104 S.Ct. 2433, 81 L.Ed.2d 247 (1984), or create a firm belief or conviction in the facts the plaintiff seeks to establish, *see, e.g., Lansdowne v. Beacon Journal Pub. Co.*, 32 Ohio St.3d 176, 180–81, 512 N.E.2d 979, 985 (1987).

Injunctive relief is considered an extraordinary remedy and courts use it cautiously and sparingly. *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982); 56 *Ohio Jurisprudence* § 14 (3d ed.2000); *see also Cleveland Constr., Inc. v. Ohio Dept. of Admin. Servs., Gen. Servs. Admin.*, 121 Ohio App.3d 372, 383, 700 N.E.2d 54, 62 (1997). "Courts will not exercise this ex-

traordinary authority when the right is doubtful or the facts are not definitely ascertained." 56 *Ohio Jurisprudence* § 15 (3d ed.2000); 11A Charles A. Wright, Arthur R. Miller and Mary Kay Kane, *Federal Practice and Procedure* § 2948 (2d ed. 1995) ("It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."); *see also Detroit Newspaper Publishers Ass'n v. Detroit Typographical Union No. 18, Int'l Typographical Union*, 471 F.2d 872, 876 (6th Cir.1972).

### B. Analysis

The Students seek to restrain the Defendants from exercising prior review over or censoring any future Blade issues. In support of their request for injunctive relief, they allege that the Defendants violated their First Amendment free speech rights when they impounded the copies of the December 20, 2002, Blade edition.

Special considerations apply to First Amendment rights in the public school context. Accordingly, in resolving this motion, the Court first reviews these special considerations. The Court next decides which type of forum analysis applies to the Students' claim. Then, the Court applies the appropriate forum standard to the Students' request for injunctive relief to determine whether the District's justifications for seizing the newspaper satisfy the applicable standard.

#### 1. First Amendment Rights in the Public School Context

Courts have long held that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). Therefore, school officials cannot punish

students solely for expressing their personal views on school premises unless the expression "substantially interfere[s] with the work of the school or impinge[s] upon the rights of other students." *Tinker,* 393 U.S. at 509, 89 S.Ct. 733. But students' first amendment rights "must be 'applied in light of the special characteristics of the school environment.'" *Hazelwood Sch. Dist. v. Kuhlmeier,* 484 U.S. 260, 266, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) (quoting *Tinker,* 393 U.S. at 506, 89 S.Ct. 733). Further, the First Amendment rights of students in the public schools "are not automatically coextensive with the rights of adults in other settings." *Bethel Sch. Dist. No. 403 v. Fraser,* 478 U.S. 675, 682, 106 S.Ct. 3159, 3164, 92 L.Ed.2d 549 (1986). Importantly, "[a] school need not tolerate student speech that is inconsistent with its 'basic educational mission,' even though the government could not censor similar speech outside the school." *Id.* (quoting *Fraser,* 478 U.S. at 685, 106 S.Ct. 3159). Finally, " '[t]he determination of what manner of speech in the classroom or in school assembly is inappropriate rests with the school board' rather than with the federal courts." *Hazelwood,* 484 U.S. at 267, 108 S.Ct. 562 (quoting *Fraser,* 478 U.S. at 683, 106 S.Ct. 3159).

### 2. Type of Forum

■ The scope of students' First Amendment rights further depends on the type of forum in which they express themselves. Courts give student speech in public fora greater protection than speech in non-public fora. Accordingly, the Court decides how to analyze the plaintiffs' First Amendment claim. The Students argue that the public forum analysis applies while the Defendants say that the Blade is a non-public forum. For the reasons that follow, the Court concludes that the Blade is a limited public forum.

For purposes of free speech analysis, the Supreme Court has identified three types of fora: 1) the traditional public forum; 2) the limited public forum or designated public forum; and 3) the non-public forum. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983). A traditional public forum is a place "which by long tradition or by government fiat ha[s] been devoted to assembly and debate," such as a street or park. *Id.* at 45, 103 S.Ct. 948. Generally, the law does not consider public schools to be traditional public fora. *Deeper Life Christian Fellowship, Inc. v. Bd. Of Educ.,* 852 F.2d 676, 679 (2d Cir.1988) (citing *Brandon v. Bd. Of Educ.,* 635 F.2d 971, 980 (2d Cir. 1980), *cert. denied,* 454 U.S. 1123, 102 S.Ct. 970, 71 L.Ed.2d 109 (1981)).

The government creates a limited public fora when it opens its property " 'for indiscriminate use by the general public,' or by some segment of the public." *Hazelwood,* 108 S.Ct. at 568 (quoting *Perry,* 460 U.S. at 47, 103 S.Ct. 948). The government may also designate a forum for a limited purpose such as use by certain speakers or the discussion of specific topics. *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.,* 473 U.S. 788, 802, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985); *Perry,* 460 U.S. at 45–46 n. 7, 103 S.Ct. 948; *see also Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (university meeting places are designated public forum for use by student groups).

In traditional and limited public fora, the government may impose content-based restrictions on speech only if they are necessary to serve a compelling state interest and are narrowly tailored to that end. *Cornelius,* 473 U.S. at 800, 105 S.Ct. 3439; *Perry,* 460 U.S. at 45, 103 S.Ct. 948; *Carey v. Brown,* 447 U.S. 455, 461, 100 S.Ct. 2286, 2290, 65 L.Ed.2d 263 (1980). Con-

versely, in nonpublic fora, restrictions on speech need only be "reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry*, 460 U.S. at 46, 103 S.Ct. 948; *see also Cornelius*, 473 U.S. at 800, 105 S.Ct. 3439.

These standards are lower in a public school. At the very least, a "school may in its capacity as publisher of a school newspaper" prohibit speech that would " 'substantially interfere with [its] work ... or impinge upon the rights of other students.' " *Hazelwood*, 484 U.S. at 271, 108 S.Ct. 562 (quoting *Tinker*, 393 U.S. at 511, 89 S.Ct. 733). If the publication at issue is a non-public forum, school officials may exercise editorial control over "the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Id.* This means that school officials may prohibit speech in a non-public forum that is "ungrammatical, poorly written, inadequately researched, biased or prejudiced, vulgar or profane, or unsuitable for immature audiences." *Id.*

Courts may deem school facilities to be public forums only if school authorities have "by policy or by practice" opened those facilities "for indiscriminate use by the general public," *Perry*, 460 U.S. at 47, 103 S.Ct. 948, or by some segment of the public, such as student organizations. *Id.*, at 46, n. 7, 103 S.Ct. 948 (citing *Widmar v. Vincent*). To determine whether the school has created a limited public forum, courts look to the school's intent. *Hazelwood*, 108 S.Ct. at 568; *Cornelius*, 473 U.S. at 802, 105 S.Ct. 3439 (stating that "[t]he government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse"); *see also Perry*, 460 U.S. at 47,

103 S.Ct. 948. Courts will not presume the government has converted a nonpublic forum into a limited public forum unless, "by policy or by practice," *Perry*, 460 U.S. at 47, 103 S.Ct. 948, the government has demonstrated a "clear intent" to do so. *Cornelius*, 473 U.S. at 802, 105 S.Ct. 3439.

The Sixth Circuit uses a two-step inquiry to determine whether a school intended to create a limited public forum. Under this analysis, the Court examines 1) whether the school intended to create a limited public forum, and 2) the context within which the forum is found. *Kincaid v. Gibson*, 236 F.3d 342, 349 (6th Cir.2001). As to the intent element, the Supreme Court instructs courts to look at six factors: 1) whether the students produced the newspaper as part of the high school curriculum; 2) whether students receive credits and grades for completing the course; 3) whether a member of the faculty oversaw the production; 4) whether the school deviated from its policy of producing the paper as part of the educational curriculum; 5) the degree of control the administration and the faculty advisor exercise; and 6) applicable written policy statements of the board. *Hazelwood*, 484 U.S. at 269–271, 108 S.Ct. 562.

Beyond *Hazelwood's* intent factors, the Sixth Circuit examines three additional intent factors, 1) the school's policy with respect to the forum, 2) the school's practice with respect to the forum, and 3) the nature of the property at issue and its compatibility with expressive activity. *Kincaid*, 236 F.3d at 349.

The Court now determines whether the Board created a limited public forum in the Blade.

### a. Intent

The first step in the limited public forum inquiry is to determine the Board's intent.

### Paper Produced As Part of High School Curriculum

The first variable of the intent analysis does not establish that the Board intended to create a limited public forum in the Blade. Specifically, the Students publish the Blade in journalism class as part of the Wooster High School curriculum.

### Students Receive Credits and Grades

The second intent factor also does not support a finding of intent to create a limited public forum because the Students receive both credits and grades for their work on the newspaper.

### Faculty Member Oversees Production

Under the third element of the intent analysis, the Court determines whether a faculty member oversees production of the school newspaper. This element does not weigh in favor of an intent to create a limited public forum because in accordance with Board policy, a faculty member oversees the Blade's production.

### Deviation From Policy of Producing the Paper As Part of the Educational Curriculum

The fourth prong of the limited public forum analysis is to decide if the school deviated from producing the paper as part of the educational curriculum. Here, student submissions make up a large part of the Blade's content, and students receive grades and credits for their participation on the paper. The District, however, also prints columns and letters to the editor from outside community members. The Blade's student editor testified that each issue contains one guest teacher column while at least three other issues throughout the school year contain columns by community members. Additionally, of the 4,500 copies produced, the District distributes only approximately 1,400 in the school. The District circulates the remaining 3,100 in the community to grocery stores, doctor's offices, and retail stores, among others. Moreover, the Board prints the Blade in the Wooster Daily Record, the town's newspaper. Therefore, the Court concludes that the District has deviated from producing the Blade as part of its educational curriculum. This shows intent to create a limited public forum.

### Degree of Control the School Administration and Faculty Advisor Exercise

The fifth intent factor requires the Court to examine how much control the school administration and the faculty advisor exercise over the newspaper. Here, although the Board policies governing student publications give the advisor control over the paper, in practice the advisor exercises little control over the Students. At the hearing, the advisor testified that the Students generally have broad control of the paper including its content and article topics. Specifically, she stated "the students basically run the program with me serving as an advisor." Additionally, the Wooster high school principal admitted that the Students have discretion as to which articles to print. He further stated that he usually never reviews the content of the Blade before publication and distribution. Therefore, the Court finds that the District and the advisor exercise minimal control over the Blade. This also supports a finding of intent to create a limited public forum in the Blade.

### Applicable Written Policies

Under the next prong of the limited public forum analysis, the Court looks to the applicable written policy statements of the Board. The Board's written policy toward the Blade is found in Board Policy 5722. Board Policy 5722 provides that the general objectives of school-sponsored publications are:

to communicate to those who are actively interested in the school—the students, the teachers, the parents, the administration, the alumni, and other members of the school community ... *to provide vehicles for the expression of student thought and action* and to act as catalysts for helping students realize goals and objectives ... to promote cooperation among taxpayers, parents, the school, and its students.

(Emphasis added). Policy 5722 further states "[school-sponsored student] publications play a vital role in the school program by interpreting students and the school to the community ... serving as a public relations media ... *developing skills in communicating via the mass media ... developing acceptable methods for preserving the constitutional provisions of free speech.*" (Emphasis added).

Finally, the Blade's masthead says the newspaper is a public forum. These policies show the Board's intent that the Blade serve as a limited public forum for the school community.

### Practice

The Court also examines the District's actual practice toward the Blade to determine whether it intended to create a limited public forum. As already mentioned, two-thirds of the Blade's press run circulates throughout the community while only one-third circulates within the school. Moreover, the Blade accepts and publishes columns and letters from non-students. Finally, although the Board policies give editorial control to the advisor, the advisor testified that in practice, the Students exercise much of the editorial control of the Blade. Importantly, the student editor, rather than the advisor, determines the content of the newspaper. " 'Actual practice speaks louder than words' in determining whether the government intended to create a limited public forum.' " *Kin-*

*caid,* 236 F.3d at 351 (citations omitted). Therefore, the Court concludes that the District's practice toward the paper also evidences an intent to create a limited public forum in the Blade.

### Nature of the Property and Compatibility With Expressive Activity

Beyond the school's policy and practice, the Court must look at the nature of the forum and its compatibility with expressive activity to determine the District's intent. Here, a student newspaper, by its very nature, exists for expressive activity. Further, the Board encourages the use of the newspaper as a forum to preserve "the constitutional provision of free speech," and "provide [a] vehicle for the expression of student thought," subject only to prohibitions on obscene, defamatory, or disruptive expression. Therefore, the Blade's compatibility with expressive activity also shows the Board's intent to open the Blade as a limited public forum.

In sum, though the Blade meets some *Hazelwood* intent factors weighing against finding a limited public forum, it differs from the *Hazelwood* newspaper in three critical respects. First, outside columnists from the community write columns and letters for the Blade. Also, the school widely distributes the Blade in the community and prints it at the town's newspaper. Finally, unlike the *Hazelwood* school district, the District has not, in practice, exercised much editorial control. Although the paper's administration is subject to an advisor's approval, the advisor testified that, in practice, the Students have broad reign. Further, unlike the *Hazelwood* principal, the Wooster principal usually never reviews the content of the paper before publication.

### b. Context

Besides looking at the Board's intent to create a limited public forum, the Court

also considers the context within which the forum is found. Here, the Blade is a school-sponsored high school student newspaper. While high school students may be more impressionable because of their youth, they are not as impressionable as elementary school students. *See Bell v. Little Axe. Ind. Sch. Dist. No. 70,* 766 F.2d 1391 (10th Cir.1985). Therefore, the Court concludes that the high school setting does not stop the Blade from being a limited public forum.

Based on the above reasoning, the Court finds that the Blade is a limited public forum.

### 3. Preliminary Injunction

Having determined that the Blade is a limited public forum, the Court applies this analysis to the Students' request for injunctive relief. In deciding whether to issue a preliminary injunction, the Court considers (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant will suffer irreparable injury absent court intervention; (3) the possibility of substantial harm to others; and (4) the impact on the public interest. *Bonnell v. Lorenzo,* 241 F.3d 800, 809 (6th Cir.2001).

### a. Strong Likelihood of Success on the Merits

■ The first factor of the preliminary injunction analysis requires the Court to determine if the Students have a strong likelihood of success on the merits. The Students argue that they are likely to succeed because they say the school officials violated their First Amendment rights to free speech and free press. Since the Court has determined that the Blade is a limited public forum, the Students will succeed on their First Amendment claim only if the disputed speech does not substantially interfere with the school's work or impinge upon the rights of other students.

Here, the speech at issue involved an article alleging that a female student admitted she had been drinking at a party and that the Board planned to punish her for it. The Students claim that the student told a Blade reporter that she had been drinking at the party. However, the Defendants dispute the truth of this fact. At the hearing, the principal and superintendent testified that at all previous times, the student in question had denied to her parents and school officials that she had been drinking. They doubted that a student who had consistently denied participation in the drinking would tell a reporter a different story, knowing the admission would be published. Further, they both said that the Board did not discipline the student because she had told school officials that she was not drinking at the party. Accordingly, the Blade article may infringe on this student's rights because it is potentially defamatory.

In Ohio, the elements of defamation are: 1) false statement concerning another; 2) that is defamatory; 3) publication to a third party; 4) causing injury to the plaintiff; and 5) with a requisite degree of fault on the defendant's part. *Jackson v. City of Columbus,* 194 F.3d 737 (6th Cir.1999). Here, the Defendants allege that the statement was false because they say the student claimed she did not drink at the party. A statement that an underage student was caught drinking is defamatory and harmful to a student's reputation because underage drinking is illegal. Without the Board's intervention, the Blade would have published the article to third persons. Therefore, without deciding whether the Students acted with the requisite degree of fault, and without deciding whether the Board would be liable for defamation, the Court concludes that the Defendants had at least a reasonable belief that the article was potentially defamatory. Accordingly, under its own policy and rele-

vant caselaw, the District could prohibit the publication of the article because it potentially infringed the right of another student.

■ The Students acknowledge that under the Board school publication policy, one express limitation on students' free speech rights is that they cannot publish defamatory material. They do not challenge the constitutionality of this restriction on speech. The Students argue, however, that even if the Board believed that the statements were defamatory, it did not have the right to make this determination. Instead, the Students allege that Board policy reserved this right exclusively to the faculty advisor. They are incorrect. Three Board policies give the District the right to determine whether material in the Blade is defamatory.

First, the Board stated in Board Policy 5721.01 that it "agrees to the practice of unrestricted censorship and/or interferences as per freedom of expression as long as such publications adhere to the established conditions and practices within this document." Since the Board reasonably believed that the article was defamatory, it therefore reasonably believed that the Students and the advisor were not following the policy practice of prohibiting the publication of defamatory material. Further, unlike the principal and superintendent, the advisor testified that she did not know that the student in question had denied to school officials that she had been drinking. Therefore, she was not aware that the article was potentially defamatory. Accordingly, under Policy 5721.01, the Board implicitly had the right to correct the situation and protect the rights of a student.

Further, Policy 5721.01 does not say that the advisor has the exclusive right to determine whether material is defamatory. It says that as between students and the advisor, "resolutions of disputes will rest with the advisor."

Next, Policy 5721 expressly gives the District the right to prohibit the distribution of certain publications. Specifically, it provides:

> *The Board reserves the right to designate and prohibit the distribution of publications which are not protected by the right of free expression because they violate the rights of others.* Such unprotected materials are those which ... *libel any specific person or persons.*
>
> *The Board reserves the right to halt the distribution of unprotected materials.*

(Emphasis added).

Finally, in Policy 5722, the Board states "[m]aterials which violate or may violate the rights of others may not be published." A listing of such materials is given in the Board's policy for "Student Sponsored Publications." Although this provision does not expressly mention the right to stop distribution, it prohibits the publication of material that potentially violates the rights of others. Webster's Third International Dictionary defines publish as "to put out an edition or circulate it to the public." Webster's Third International Dictionary 1993). Therefore, Policy 5722 supports the District's right to stop distribution of material that violates the rights of others.

At the hearing the Plaintiffs claimed that Policy 5721 does not apply to the Blade. They, however, failed to offer any evidence to support this assertion other than noting that Policy 5721 is titled "student-sponsored publications" while the other two policies apply to "school-sponsored publications." Board Policy 5721 expressly states, however, that it applies to "newspapers." Further, the superintendent testified that he believed all three policies apply to the Blade. Even if Policy 5721 does not apply to the Blade, the other two

policies, on their own, support the Board's right to bar the publication of unprotected speech in the Blade that it reasonably believed infringed the rights of a student.

■ The Students also claim that even if the material was defamatory and the Board had the right to make that determination, it could not do so without conducting an impermissible prior review. However, Policy 5721.01 expressly states "freedom [against prior review] does not extend to the three (3) classifications of material that are prohibited by State and/or Federal law or not protected by the First Amendment [including] ... defamatory [material]." Further, it is well established that defamatory expression falls outside the reach of the First Amendment. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). Here, the Board had a reasonable belief that the material was potentially defamatory.

■ Finally, the Students argue that the District acted unconstitutionally in seizing the entire newspaper rather than deleting the two sentences at issue. However, the superintendent testified he was concerned about potential liability for defamation based on the article. Therefore, to minimize or prevent the Board's liability, he felt that he needed to account for all copies of the already printed paper.

In sum, while the Court does not decide whether the article was, in fact, defamatory, it finds that the District reasonably believed that the Blade article was potentially defamatory. Therefore, the Plaintiffs do not show by clear and convincing evidence that the Defendants violated their constitutional rights in impounding the Blade.

b. Irreparable Harm

■ The next preliminary injunction factor is deciding whether the Students will suffer irreparable harm absent court intervention. Assuming *arguendo* that the Students had shown they were likely to succeed on the merits, they do not show irreparable harm.

The confiscation of the December 20, 2002, issues of the Blade appears to be an isolated incident. The Students do not allege and the record contains no evidence that school officials have seized Blade editions in the past. Further, on January 15, 2002, the Students distributed the December 20, 2002, Blade issue. Other than the deletion of the two disputed sentences, the issue contained the original version of the underage drinking article. Finally, on January 17, 2003, the Students published the next scheduled Blade edition without incident.

At most, this evidence shows that the Defendants could potentially seize the Blade again. It does not, however, show by clear and convincing evidence that the Defendants are likely to do so. Therefore, based on the absence of any indication that the Board will impound the paper again, the Court concludes that the Students have not shown irreparable harm by clear and convincing evidence. The party seeking the injunction must establish its case by clear and convincing evidence. *Garlock, Inc.*, 404 F.2d at 257. Further, courts may only grant the extraordinary remedy of a preliminary injunction when the movant carries his burden of persuasion. *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir.2000).

Finally, although a party may show irreparable harm based on a violation of his First Amendment rights, the party must also show substantial likelihood of success on the merits to meet the irreparable harm showing in this manner. *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir.1998). The Students fail to establish substantial likelihood of success.

Because the Students fail to show the first two factors of the preliminary injunction analysis, the Court does not reach the remaining factors.

In sum, the Court concludes that the Students' fail to show substantial likelihood of success on the merits or irreparable harm. Therefore, their motion for a preliminary injunction fails. To be clear, however, the Court does not conclude at this stage of the suit that the school officials did not violate the Students' First Amendment rights. The Court also does not find that the Students' article was defamatory. Instead, the Court finds that the Students have not met the high burden to prove their right to a preliminary injunction by clear and convincing evidence.

### III. Conclusion

For the reasons discussed above, the Court denies Plaintiffs' motion for a preliminary injunction.

IT IS SO ORDERED.