**Katherine DEAN, a minor, through her mother and next friend, Coleen Elsarelli, Plaintiffs,**

v.

**UTICA COMMUNITY SCHOOLS, and Joan C. Sergent, in her official and individual capacities Defendants.**

No. 03–CV–71367 DT.

United States District Court,
E.D. Michigan,
Southern Division.

Nov. 17, 2004.

Andrew A. Nickelhoff, Sachs Waldman, Detroit, MI, Kary L. Moss, Michael J. Steinberg, American Civil Liberties Union Fund of Michigan, Detroit, MI, for Plaintiff.

Joseph C. Bennett, Clark Hill, Birmingham, MI, Suzanne P. Bartos, Plunkett & Cooney, Detroit, MI, for Defendants.

*OPINION IN SUPPORT OF ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [17] AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [23]*

TARNOW, District Judge.

## I. INTRODUCTION

Once a government is committed to the principle of silencing the voice of opposition, it has only one way to go, and that is down the path of increasingly repressive measures, until it becomes a source of terror to all its citizens and creates a country where everyone lives in fear.

Harry S. Truman, Special Message to the Congress on the Internal Security of the United States, August 8, 1950

In this civil rights action pursuant to 42 U.S.C. § 1983, plaintiff Katherine Dean, through her mother and next friend Colleen Elsarelli, alleges that defendants Utica Community Schools (UCS) and UCS Superintendent Joan C. Sergent violated her freedoms of speech and press under the First and Fourteenth Amendments by censoring an article she wrote for the Utica High School newspaper, the *Arrow*. Plaintiff's complaint seeks a declaration that the defendants violated her First Amendment right to free speech and freedom of the press, an injunction compelling Utica Community Schools to publish her news article with an explanation that the article was unconstitutionally censored, nominal damages, and costs and attorney fees pursuant to 42 U.S.C. § 1988. On February 18, 2004, the parties filed cross-motions for summary judgment and supporting briefs. On October 12, 2004, the Court heard oral argument.[1] At the motion hearing, the plaintiff withdrew her claim for damages.

After considering the arguments and reviewing the parties' pleadings, the plaintiff's motion for summary judgment is GRANTED and the defendants' motion for summary judgment is DENIED.

## II. BACKROUND

### A. THE PARTIES

Plaintiff Katherine (Katy) Dean is a former student of Utica High School. While in high school, Dean was a member of the

---

1. The Court did not hold an evidentiary hearing. The facts contained in this opinion are taken from the deposition and declaration testimony of the witnesses.

*Arrow,* Utica High School's student newspaper. Dean received academic credit for her work on the *Arrow* as a staff reporter and sports co-editor.

Gloria Olman was the teacher who taught the journalism, newspaper, desktop publishing, yearbook and English classes at Utica High School. She also taught graduate-level journalism courses at Michigan State University and Oakland University. Olman was the faculty advisor to the *Arrow.*

Defendant UCS is a public school district that is in charge of Utica High School. Richard Machesky is the principal at Utica High School. Machesky reports directly to UCS's director of secondary education, Sue Meyer. In turn, Meyer reports to Randall Eckhardt, who is UCS's assistant superintendent for instruction.

Defendant Dr. Joan C. Sergent is the superintendent of UCS. She reports to the Utica Community Schools Board of Education.

## B. THE ARROW

### 1. Management and Distribution of the Paper

The *Arrow* is the school-sponsored student newspaper for Utica High School. The *Arrow*'s staff is comprised of approximately twenty high school students. The *Arrow* is published on a monthly basis, and is funded by the sale of advertising to local businesses. The student journalists on the *Arrow* staff control the content and production of the paper and are responsible for making all of the paper's major editorial decisions without significant administrative intervention. Student journalists solicit and sign contracts with advertisers, determine the advertising rates, decide what topics will be covered by the paper, develop story ideas, and assign stories. Students also select editors and determine

the news stand price for the paper. The faculty advisor does not regulate the subjects covered by students, although she provides advice on which stories to run and reviews, criticizes, and checks the grammar contained in articles.

The *Arrow* is distributed to students as well as members of the general public. About one-half of its press run is mailed to the homes or businesses of various subscribers, including parents, alumni, other school papers, and the community. A local paper, the *Macomb Daily,* publishes articles from the *Arrow* twice a year.

The *Arrow* has often covered controversial topics, including teenage sex, suicide, drug and alcohol abuse, and sexual orientation. Although such topics occasionally incurred negative reactions from faculty members, administration, and others, Olman was never instructed to remove such stories.

### 2. Administration Involvement With the *Arrow*

Neither Superintendent Sergent nor anyone else from UCS administration had any involvement with the *Arrow.* The student journalists for the *Arrow* did not defer to school administrators regarding editorial or other decisions for the paper. Dean understood that she could write on whatever topic she wished if it were factually supported and relevant to the *Arrow*'s community of readers. Prior to March of 2002, Ms. Olman was never instructed to change or remove a story from the paper.

Superintendent Sergent has a subscription to the *Arrow,* but she only reads it occasionally, does not read every article, and does not review articles for their accuracy. Prior to March of 2002, she never involved herself in the operation of any student newspaper. Since her removal of Dean's article on March 7, 2002, Superin-

tendent Sergent has not intervened in any editorial decision regarding the *Arrow*.

## C. DEAN PREPARES HER ARTICLE FOR THE MARCH 15, 2002 EDITION OF THE ARROW

In February, 2002, during a meeting of the *Arrow* staff, staff member Dan Butts suggested an idea for an article about a lawsuit pending against UCS. The plaintiffs in the lawsuit, Joanne and Rey Frances, were residents of a neighborhood adjoining the UCS bus garage who claimed that diesel fumes from idling buses constituted a nuisance, violated their right of privacy and harmed their health.[2] The lawsuit had recently been discussed at a school board meeting and an article concerning the lawsuit had been printed in a local newspaper, *The Source*. The students agreed that the story was relevant to the school community because the garage is located near the school's athletic fields. In addition, students live in the neighborhood next to the garage.

Dean and Butts investigated the story during their mid-winter break in February, 2002. They viewed a video tape of a school board meeting where Mrs. Frances spoke about the diesel fume problem. They interviewed the Frances' at their home for approximately three or four hours. Dean's story about the lawsuit was to be sent to the printer on March 7, 2002 for publication in the March 15, 2002 edition of the *Arrow*.

On the advice of Gloria Olman, Dean attempted to interview UCS officials by contacting Superintendent Sergent and UCS transportation officials. These individuals would not comment, but referred her to a UCS community relations official. Dean spoke to the official two or three

times, but she was told there would be no comment, as it was policy not to comment on pending litigation. Dean also called Sergent's office several times in order to verify comments by the Frances' that Sergent had visited their home. Sergent would not return Dean's calls, and the community relations official refused further comment.

Dean also questioned Principal Machesky. Machesky responded that he did not know anything about the case but commented that is was an interesting story to cover. Finally, Dean researched the health effects of diesel exhaust on the internet.

Dean submitted early drafts of the story to Ms. Olman and a student teacher for their review. As of Wednesday, March 6, 2002, the day before the *Arrow* was to go to press, Dean's story was nearing completion.

That morning, Ms. Olman visited Principal Machesky in his office. She mentioned that her students were doing a story on the bus garage. The principal commented that there was an issue with students parking their cars in the adjoining neighborhood and that the *Arrow* should consider running a story on that issue as well. Olman told Machesky that she was seeking to obtain a response from the school district on the issue. Principal Machesky referred her to the director of community relations.

## D. THE PRINCIPAL RECEIVES A DRAFT COPY OF DEAN'S ARTICLE AND FORWARDS A COPY TO SUPERINTENDENT SERGENT

Principal Machesky obtained a copy of Dean's article prior to the publication date. Machesky testified that he was concerned about the use of pseudonyms and what he

---

2. Rey Frances died on July 7, 2002, two years after being diagnosed with lung cancer. The Frances' lawsuit against UCS ended in an out-of-court settlement in 2003.

believed to be unreliable sources in Dean's article. He believed that the unreliable sources were comprised of "a reference to a school district employee which did not have a name [and] scientific data attributed to *USA Today*." Machesky gave a copy of the article to Assistant Superintendent Eckhardt, who forwarded it to Superintendent Sergent. Sergent told Eckhardt that she believed the story contained a number of "inaccuracies."

Superintendent Sergent mistakenly believed that she was reading the final version of Dean's article because Eckhardt represented to her that it was a final draft. The version of the article reviewed by Machesky, Eckardt and Sergent on March 6, 2002, is reproduced in Appenix A. The version of the article as revised by the students is reproduced in Appendix B.

Assistant Superintendent Eckhardt told Machesky to remove the article. The only reason given to Machesky for the removal of the article was that the district was involved in litigation and it "would be inappropriate for the school newspaper to comment on that." (Machesky Dep., p. 42).

### E. SUPERINTENDENT SERGENT ORDERS THE REMOVAL OF DEAN'S STORY FROM THE ARROW

The next morning, Sergent and Eckhart reviewed the unrevised version of Dean's article. Eckhardt had a telephone conversation with Joseph Bennett, an attorney for the school district. Based on the advice of counsel, both Sergent and Eckardt decided that the story would not be printed. Sergent and Eckhardt testified that Sergent alone made the decision to halt publication of the story. She did not consider giving the students an opportunity to revise the article to address her concerns. Assistant Superintendent Eckhardt informed Principal Machesky that Dean's article was not to be printed. Principal Machesky called Ms. Olman into his office and told her to remove the article. Ms. Olman objected to the decision and asked for an explanation. Machesky told her that it was inappropriate for the paper to run an article specific to the litigation. Ms. Olman offered to revise the article, and asked for Machesky's assistance in dealing with UCS. Principal Machesky again ordered that the article be pulled from the *Arrow*.

Superintendent Sergent testified that publication would not have interfered with the operation of the school, nor would it have prevented the school from performing its normal function and operation. She testified that had the students used the Frances' names instead of pseudonyms (as they did on March 7, 2002), that flaw in the article would have been corrected. She deemed the article to be inaccurate because environmental studies conducted for the Frances litigation "indicated that our operations had no [health] impact." (Sergent Dep. p. 58) According to Sergent, she never visited the Frances' residence.

The *Macomb Daily* published a revised version of Dean's article a few days later. The students on the *Arrow* staff wrote letters to Principal Machesky and Superintendent Sergent seeking reconsideration the decision to remove Dean's article. Both officials refused to reconsider the decision.

### III. STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P 56(c). The moving party bears the initial responsibility of demonstrating that there is an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Material facts are determined

by the substantive law in the case. *Anderson v. Liberty Lobby*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All inferences must be made in a light most favorable to the non-moving party. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Cross motions for summary judgment authorize the Court to assume that there is no evidence which needs to be considered other than that which has been filed by the parties. *Greer v. United States*, 207 F.3d 322, 326 (6th Cir.2000). However,

> The fact that both parties make motions for summary judgment, and each contends in support of [their] respective motion that no genuine issue of fact exists, does not require the Court to rule that no fact issue exists.

*Begnaud v. White*, 170 F.2d 323, 327 (6th Cir.1948).

### IV. DISCUSSION

The newspaper class at Utica High School is intended to teach journalism. A core value of being a journalist is to understand the role of the press in a free society. That role is to provide an independent source of information so that a citizen can make informed decisions. It is often the case that this core value of journalistic independence requires a journalist to question authority rather than side with authority. Thus, if the role of the press in a democratic society is to have any value, all journalists-including student journalists-must be allowed to publish viewpoints contrary to those of state authorities without intervention or censorship by the authorities themselves. Without protection, the freedoms of speech and press are meaningless and the press becomes a mere channel for official thought.

As the Supreme Court observed in *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969):

> In our system, state-operated schools may not be enclaves of totalitarianism. School officials do not possess absolute authority over their students. Students in school as well as out of school are 'persons' under our Constitution. They are possessed of fundamental rights which the State must respect, just as they themselves must respect their obligations to the State. In our system, students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate. They may not be confined to the expression of those sentiments that are officially approved. In the absence of a specific showing of constitutionally valid reasons to regulate their speech, students are entitled to freedom of expression of their views.

*Tinker*, 393 U.S. at 511, 89 S.Ct. 733.

The freedoms of student journalists are by no means un-fettered by legitimate concerns for school administration and education. However, the First Amendment undoubtedly protects the freedom of student journalists, under circumstances such as those presented in this case, to maintain their school-sponsored publications as limited public forums for the expression of viewpoints that question, endorse, or deviate from the official viewpoints of state authorities.

### A. STANDARDS GOVERNING STUDENT SPEECH IN PUBLIC SCHOOLS

#### 1. Categories of Student Speech

The First Amendment to the United States Constitution provides that "Congress shall make no law...abridging the freedom of speech, or of the press." U.S. Const., amend. I. These prohibitions have been made applicable to the states through

the Fourteenth Amendment. *See, e.g., McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 336, n. 1, 115 S.Ct. 1511, 1514, 131 L.Ed.2d 426 (1995). There is no dispute that the actions of the defendants in this case constitute "state action" for constitutional purposes.

For First Amendment purposes, student speech falls into three categories, and each category justifies a corresponding level of official regulation. Student speech that "happens to occur on school premises" is governed by *Tinker v. Des Moines Ind. Sch. Dist.,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). Pure student speech, such as the black armbands worn by the students protesting the Vietnam War in *Tinker* must be tolerated by the school "unless school authorities have reason to believe that such expression will 'substantially interfere with the work of the school or impinge upon the rights of other students.'" *Hazelwood Sch. Dist. v. Kuhlmeier,* 484 U.S. 260, 271, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988).

"Government speech," such as a principal speaking at a school assembly, is subject to any viewpoint-based regulation because the school itself may always choose what to say and not to say. *See Rosenberger v. Rector and Visitors of the University of Virginia,* 515 U.S. 819, 833, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995)

Finally, "school-sponsored" speech is governed by *Hazelwood, supra.* School-sponsored speech is student speech that a school affirmatively promotes as opposed to speech that a school merely tolerates. *Hazelwood,* 484 U.S. at 270–271, 108 S.Ct. 562, 98 L.Ed.2d 592. "Expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school" consti-

tute "school-sponsored" speech over which the school may exercise editorial control so long as its actions in doing so "are reasonably related to legitimate pedagogical concerns." *Id.* at 271, 273, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592.

## 2. Forum Analysis

Whether a particular restriction on student speech satisfies the First Amendment depends on the nature of the speech forum involved. In other words, even "school-sponsored" speech may be subject to less administrative control where such "school-sponsored" speech occurs in a public forum.

■ As to speech in a limited public forum,

> [T]he government may impose only reasonable time, place, and manner regulations, and content-based regulations that are narrowly drawn to effectuate a compelling state interest.

*Kincaid v. Gibson,* 236 F.3d 342, 354. (6th Cir.2001) (en banc). The *Hazelwood* standard is inapplicable where a school-sponsored publication is a limited public forum. *Kincaid,* 236 F.3d at 346 and n. 5.

In *Hazelwood,* the Court began its analysis by examining whether the student newspaper at issue was a limited public forum. *Hazelwood,* 484 U.S. at 267–268, 108 S.Ct. 562. This is the proper threshold question because speech in a limited public forum is less susceptible to regulation by the state.[3] As the Court concluded in *Hazelwood:*

> School officials did not evince either "by policy or by practice" any intent to open the pages of Spectrum to "indiscriminate use" by its student reporters and editors, or by the student body generally.

---

**3.** In *Hazelwood,* the Supreme Court declined to establish a blanket standard for speech regulations involving student newspapers.

The *Hazelwood* approach to student speech is discussed more fully below.

Instead, they "reserve[d] the forum for its intended purpos[e]" as a supervised learning experience for journalism students. Accordingly, school officials were entitled to regulate the contents of Spectrum in any reasonable manner. It is this standard, rather than our decision in *Tinker,* that governs this case.

*Id* (internal citations omitted). In *Kincaid,* an *en banc* panel of the Court of Appeals for the Sixth Circuit set forth the following description of First Amendment forum analysis:

The Supreme Court has recognized three types of fora. The first type is a traditional public forum. A traditional public forum is a place "which by long tradition or by government fiat ha[s] been devoted to assembly and debate," such as a street or park. In traditional public fora, "the rights of the state to limit expressive activity are sharply circumscribed": the government may enforce content-based restrictions only if they are narrowly drawn to serve a compelling interest, and may enforce content-neutral time, place, and manner regulations only if they are "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." The second type of forum has been alternatively described as a "limited public forum." The government may open a limited public forum "for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." The third and final type of forum is a nonpublic forum. The government may control access to a nonpublic forum "based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral."

*Kincaid,* 236 F.3d at 348–349. (internal citations omitted).

■ Based on the evidence in the record, the Court finds that the *Arrow* is a limited public forum because it has been opened for use by the public for speech and discussion concerning matters that are relevant to the Utica High School community and its readership. Even if the *Arrow* is a non-public forum, the defendant's suppression of Dean's article was unreasonable.

## B. THE ARROW IS A LIMITED PUBLIC FORUM

The government creates a limited public forum when it provides its resources "for indiscriminate use by the general public or by some segment of the public." *Perry Educ. Assn. v. Perry Local Educators' Assn.,* 460 U.S. 37, 47, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983). The government may also designate a forum for a limited purpose such as use by certain speakers or discussion of specific topics. *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.,* 473 U.S. 788, 802, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985). A school facility may be deemed to be a public forum if school authorities "by policy or practice" opened that facility for indiscriminate use by the general public, or by some segment for the public, such as student organizations. *Draudt v. City of Wooster Dist. Bd. of Educ.,* 246 F.Supp.2d 820, 827 (N.D.Ohio 2003) (citing *Perry,* 460 U.S. at 47, 103 S.Ct. 948). "Courts will not presume the government has converted a nonpublic forum into a limited public forum unless, 'by policy or by practice,' the government has demonstrated a 'clear intent' to do so". *Id.* (citing *Perry,* 460 U.S. at 47, 103 S.Ct. 948; *Cornelius,* 473 U.S. at 802, 105 S.Ct. 3439). However, " 'actual practice speaks louder than words' in determining whether the government intend-

ed to create a limited public forum." *Kincaid,* 236 F.3d at 351. (internal citations omitted).

The Sixth Circuit employs a two-step test to determine the type of forum at issue. The test examines (1) whether the school intended to create a limited public forum; and (2) the context in which the forum is found. *Kincaid v. Gibson,* 236 F.3d 342, 349 (6th Cir.2001) (*en banc*). These steps are addressed in turn.

In *Hazelwood,* the Supreme Court set forth six "intent factors" applicable in making a forum determination: (1) whether the students produced the newspaper as part of the high school curriculum; (2) whether students receive credits and grades for completing the course; (3) whether a member of the faculty oversaw the production; (4) whether the school deviated from its policy of producing the paper as part of the educational curriculum; (5) the degree of control the administration and the faculty advisor exercise; and (6) applicable written policy statements of the board of education.

The Sixth Circuit examines three additional intent factors: (1) the school's policy with respect to the forum; (2) the school's practice with respect to the forum; and (3) the nature of the property at issue and its compatibility with expressive activity. *Draudt,* 246 F.Supp.2d at 827 (citing *Hazelwood,* 484 U.S. at 269–271, 108 S.Ct. 562; *Kincaid,* 236 F.3d at 349). These intent factors are considered in turn.

### i. Students Produce the Arrow As Part of the High School Curriculum

There is no dispute that the *Arrow* is published as part of the high school curriculum established by UCS. This factor does not establish that UCS intended to operate the *Arrow* as a limited public forum.

### ii. Students Receive Credit and Grades for Completing the Newspaper Course

There is no dispute that students receive credit and are graded for their work on the *Arrow.* This factor does not establish that UCS intended that the *Arrow* serve as a limited speech forum.

### iii. A Faculty Member Oversees Production of the Arrow

In March of 2002, production of the *Arrow* was supervised by faculty advisor Gloria Olman. This element does not favor a finding that the *Arrow* is a limited public forum. However, there is no genuine factual dispute that for all practical purposes Olman allowed the students to control every major facet of the *Arrow*'s operation.

### iv. UCS Deviated from its Policy of Producing the Arrow Exclusively as Part of the Educational Curriculum

The course description for the "newspaper" class states that students "may take this class for credit more than once." This description suggests that the district actively encourages sustained participation in student journalism in an extracurricular manner that is inconsistent with an exclusive focus on classroom academics (the Court presumes, for example, that the course description for calculus does not state that "students may take this class for credit more than once.").

To the extent that UCS's documentation sets forth a policy whereby the *Arrow* is produced solely as part of the educational curriculum, the district has deviated from that policy by allowing the *Arrow*'s student staff to independently manage the paper's affairs. In all relevant respects, the *Arrow* was a student-run newspaper.

The *Arrow* also accepted and published letters and guest columns from anyone, subject to the approval of the *Arrow* staff.

The *Macomb Daily* publishes articles from the *Arrow* twice a year. *See Draudt*, 246 F.Supp.2d at 829 (observing that publication in an a local non-student paper favored a finding of a public forum). These facts favor a finding that the *Arrow* is a limited public forum.

**v. With the Sole Exception of the March 7, 2002 Issue, UCS Administration and Faculty Exercise Little or No Control Over the Content of the Arrow**

The faculty advisor to the *Arrow* did not regulate the subjects covered by student reporters. Student journalists did not submit any content to UCS officials for pre-publication review. In practice, any control that UCS may have exercised over the *Arrow* was delegated to the paper's student staff. Such practice indicates that the *Arrow* was intended to serve as a limited public forum.

**vi. Applicable Written Policies**

UCS has not produced a single document stating that the *Arrow* is not a public forum. Indeed, Assistant Superintendent Eckhardt testified that he does not know of any documents that contain guidelines or standards for the publication of student articles in the *Arrow* or any other student newspaper in the district and that there is no document that states that the *Arrow* is not a public forum.

The curriculum guides, course descriptions and masthead for the *Arrow* are evidence that the *Arrow* is a limited public forum. According to the curriculum guide, the class is intended to:

> plan, assign, and produce a regularly scheduled newspaper for the school/community audience...in accordance with community standards.

According to the guidelines, students are also expected to "[e]mploy an understanding of the rights and responsibilities that accompany the First Amendment." The language of these guidelines indicate a clear intent to open the *Arrow* as a news forum rather than exclusively as an educational tool.

The course description establishes that UCS newspaper students are "required to sell advertisements for their publication." The fact that the advertising revenue generated by students covers the costs of printing the *Arrow* is a factor that favors a finding that the *Arrow* was maintained as a vehicle for broad expression and not merely in-class instruction. The evidence in the record suggests that advertising revenues were used to cover the paper's printing costs.

Finally, the masthead for the *Arrow* states:

> Our main purpose is to (1) inform the students, faculty and community of school related news; (2) broaden the range of thinking of staff members and readers; (3) provide a forum for readers; (4)train the students in the function of the press in a democratic society; and (5) provide entertaining features of interest to the students.

In *Hazelwood,* the Supreme Court stated that the masthead must be "understood in the context of the paper's role in the school's curriculum." *Hazelwood, supra* at 269. In this case, the context includes the fact that the *Arrow* had often covered many controversial topics, including teenage sex, suicide, drug abuse, abortion, and sexual orientation. The *Arrow* regularly included guest columns from students and non-students, and was circulated to the general public. Prior to March, 2002, no member of UCS administration had ever reviewed the paper prior to publication. Under all of the circumstances of this case, the *Arrow*'s masthead supports a finding that the *Arrow* is a limited public forum.

### vii. Practice

" '[A]ctual practice speaks louder than words' in determining whether the government intended to create a limited public forum." *Kincaid,* 236 F.3d at 351. (internal citations omitted). In this case, the defendants' practice toward the *Arrow* is evidence of an intent to create a limited public forum in the paper.

For approximately twenty-five years, from 1977 through 2002, UCS administration never intervened in the editorial process for any of its student newspapers. Since the decision to remove Dean's article was made in March of 2002, no UCS administration official has intervened in the editorial process for the *Arrow.* Sergent's decision to pull Dean's article from the March, 15, 2002 edition of the *Arrow* is therefore a violation of a rule established through years of actual practice, which allowed the student staff of the *Arrow* to function as an independent news source on issues relevant to the school community. There is no dispute that the *Arrow* is distributed to a broad readership both within and without the school community.

### viii. The Property at Issue is Compatible With Expressive Activity

A "student newspaper, by its very nature, exists for expressive activity." *Draudt,* 246 F.Supp.2d at 829. The *Arrow* is within this rule. The *Arrow*'s decision to publish an article on the Frances' lawsuit was consistent with the traditions of the paper and the inherent nature of newspaper journalism in a democracy.

### B. SUPPRESSION OF DEAN'S ARTICLE WAS NOT REASONABLE UNDER *HAZELWOOD*

■ In *Hazelwood School District v. Kuhlmeier,* 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), the Supreme Court held that the First Amendment does not prohibit school officials from "exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Hazelwood,* 484 U.S. at 273, 108 S.Ct. 562.

■ Of course, "[t]he universe of legitimate pedagogical concerns is by no means confined to the academic...[for it includes] discipline, courtesy, and respect for authority." *Poling v. Murphy,* 872 F.2d 757, 762 (6th Cir.1989). However, the Court finds that defendants' stated pedagogical concerns are not supported by the evidence in the record and that defendants' complete removal of Dean's article was not reasonably related to any stated pedagogical concern.[4]

In *Hazelwood,* three students sued the Hazelwood school district after their high school principal removed two pages of stories concerning teen pregnancy, divorce, and a student's complaints about her father's inattentiveness from their school newspaper. In affirming the ruling of the District Court, the Supreme Court clarified that, "[w]e...agree with the District Court that the decision to excise the two pages containing the problematic articles was reasonable *given the particular circumstances of this case." Id.* at 275–276,

4. Defendants' articulation of "legitimate pedagogical concerns" is limited. At the hearing on the parties' cross-motions, defense counsel stated that the legitimate pedagogical concerns behind the removal of the article were: (1) the article was not researched properly and contained inaccuracies; (2) the article referenced *USA Today,* which superintendent Sergent believed to be an inadequate research tool; (3) the article was biased and prejudicial; (4) the article contained pseudonyms; and (5) the article alleged that UCS's actions had endangered the community, an allegation which UCS claims is untrue. (Tr., pp. 9–16).

108 S.Ct. 562 (emphasis added). The Court emphasized the following factors in its analysis: (1) privacy; (2) "frank talk" [on sexual topics] and the maturity level of the potential audience; (3) fairness and balance, including the opportunity for relevant parties to respond; (4) expert testimony regarding journalistic standards; (5) the immediacy of the editorial decision and whether it would deprive the students of a paper; and (6) the experience of the faculty advisor and in particular their experience with editorial procedures. The Court also cautioned that a school may censor "speech that is, for example, ungrammatical, poorly written, inadequately researched, biased or prejudiced, vulgar or profane, or unsuitable for immature audiences." *Hazelwood,* 484 U.S. at 271, 108 S.Ct. 562.

In this case, none of the *Hazelwood* factors favor a finding that defendants' removal of Dean's article was reasonably related to a legitimate pedagogical concern. The Court will address the factors considered in *Hazelwood,* the factors urged by the defendants, and the pedagogical concerns set forth in *Poling v. Murphy,* 872 F.2d 757, 762 (6th Cir.1989).

### i. Privacy Concerns

Dean's article did not raise any privacy concerns because *The Source* had already printed articles concerning the Frances' lawsuit, which was a matter of public record prior to the publication of Dean's article.

### ii. Sexual "Frank Talk" and/or Suitability for Potential Audience

Dean's article did not contain any sexual "frank talk" and could not reasonably be perceived as being unsuitable for immature audiences. There is simply no rea-

sonable basis to conclude that the subject matter of Dean's article was inappropriate for distribution to any members of the *Arrow*'s readership.

### iii. Fairness, Balance, and Opportunity to Respond

Dean attempted to incorporate conflicting views of the Frances' lawsuit. She interviewed or attempted to interview all of the relevant UCS officials, but they would not respond. Dean's article notes that "district officials, as well as township officials, refused to comment on the pending lawsuit." Plaintiff's expert, Jane Briggs–Bunting, stated in her declaration that the inclusion of this statement is essential to fair and balanced reporting, because as a matter of fair and balance journalism "[o]ne party to a dispute cannot prevent coverage of a story by refusing to comment or provide information." (Briggs–Bunting Dec. ¶ 11) Neal Shine's declaration states:

> In my opinion the reporting was balanced. It is not unusual in news reporting on litigation that one or both parties will refuse to comment. That does not prevent the reporter from doing his job. The fact that various individuals refused a request for comment on the lawsuit was properly reported in the story.

(Shine Dec. ¶ 7). Dean's article also sets forth the conflicting viewpoints on the health effects of diesel fumes, and concludes that the link between diesel fumes and cancer is not fully established.

### iv. Expert Testimony

The only expert testimony in the record is provided in support of the plaintiff by Gloria Olman, Jane Briggs–Bunting and Neal Shine.[5] At oral argument, defense

---

**5.** Briggs–Bunting has been teaching journalism at the post-secondary level for over twen-

ty-five years, is the director of the journalism department at Michigan State University, an

counsel conceded that the defendants did not solicit or obtain expert testimony stating that Dean's article was not good or acceptable journalism.

### v. Timing

Although the defendants' decision to censor Dean's story was imposed on the day that the *Arrow* was to go to press, the students were still capable of revising the story. The concerns identified by the defendants were all correctable.

### vi. Experience of Journalism Instructor

There was no discontinuity or confusion between various journalism instructors at Utica High. Ms. Olman had been the full-time journalism instructor at Utica High School and faculty advisor to the *Arrow* since 1977. Unlike the newspaper in *Hazelwood*, the *Arrow* was not subject to mandatory pre-publication review and revision by the principal. *Hazelwood*, 484 U.S. at 263, 108 S.Ct. 562. Indeed, none of the officials involved in this case could recall a single instance of administrative involvement with the content of the *Arrow* prior to or following the removal of Dean's article in March of 2002.

### vii. Grammar

There is no indication that Dean's article contained serious grammatical errors, such that total removal of the article was reasonably necessary to fulfill the paper's educational objectives. The fact that the *Arrow* staff and Machesky cooperated in the revision of an objectionable article about teen sex during the following school

year indicates that revisions, rather than removal, could have addressed administration concerns.

### viii. Writing Quality

The only expert testimony in the record, from Jane Briggs–Bunting and Neal Shine, indicates that Dean's article was well written and adhered to established journalistic standards. Plaintiff also submitted articles concerning the Frances' from local newspapers, including the *Detroit News*. Defendants have not identified, and the Court cannot ascertain, a significant disparity in quality between Dean's article in the *Arrow* and the similar articles in "professional" newspapers.

### ix. Research

Although defendants assert that Dean's article was poorly researched, Dean and Butts researched their subject carefully and consulted with Olman several times in order to contact any available UCS officials for accurate information. Defendants insist that their removal of Dean's article was justified in part because *USA Today* is not a credible source, however, Olman, Briggs–Bunting and Shine all stated in their declarations that Dean's citation to research contained in *USA Today* was consistent with sound journalistic practice.

### x. Bias and Prejudice

The defendants assert that the story was biased and prejudiced. The article expressly indicates that the school district declined to comment on the pending litigation and that Mr. Frances' physicians could not conclude that the diesel fumes

attorney specializing in media law and the author of *Guidelines for Reporters in Michigan*. She has also been inducted into the Michigan Journalism Hall of Fame. Briggs–Bunting submitted a declaration stating that the journalistic quality of Dean's story is excellent for a high-school publication, and meets all of the standards for a college newspaper.

Neal Shine is the former publisher and president of the *Detroit Free Press*. Upon reviewing Dean's article, Shine stated in his declaration that her story "is a perfectly legitimate news story for any newspaper, and certainly is excellent news reporting for a high school level newspaper." Shine detected no journalistic flaws, and disagreed with the defendants' assessment of the story.

had caused his illness. Both Briggs–Bunting and Shine stated that the article is well-researched and conforms with established journalistic principles. Briggs–Bunting and Shine also stated that the article is objective and does not convey the personal bias or prejudice of its author.

#### xi. Pseudonyms

As to the use of pseudonyms, defendants have not produced any evidence which explains how the use of pseudonyms in Dean's story would have compromised a legitimate pedagogical objective. The pseudonyms were removed and the Frances' names were used in the final draft of the article.

#### xii. Accuracy

Superintendent Sergent testified that the only reason she intervened in the publication of Dean's article was because "if was filled with inaccuracies" and "the Utica Community Schools does not permit an open forum regarding school newspaper publications." (Sergent Dep., pp. 72–73, 90). Defendants' only specific explanation concerning the accuracy of Dean's article was provided by Sergent at her deposition:

> Well, the inaccuracies in the article, first of all, would be the pseudonyms that are in here regarding the individuals that have sued the school system. Also, the inaccuracies would include issues directly related to medical concerns which Utica Community Schools have conducted environmental studies regarding that facility and we know that our operation has no impact. There is really some misinformation in here which I wouldn't consider reliable, based on the fact that it's from the-I think *USA Today,* regarding medical information. There is hearsay from residents in the area. There is only the individual's who is interview[ed] version of what happened in terms of conversations with public officials. There is a statement that indicates I visited the Frances home, and that is not true, I have never visited the Frances home. So there are a number of inaccuracies in the article.

Sergent Dep. at 22–23.

Superintendent Sergent's testimony reveals that the school district, based on its own environmental studies, maintained a difference of opinion with the Frances' and their doctors regarding the merits of the underlying lawsuit. Her testimony does not establish that Dean's article was inaccurate. Additionally, the issue in this case is whether the defendants properly considered the merits of Dean's article as student journalism. The issue is not whether the allegations in the underlying lawsuit against UCS were ever accurate or meritorious. Therefore, the inaccuracies alleged by Superintendent Sergent are not material.

Dean's article properly and accurately attributes its quotations to their sources. The article qualifies any statement made by its sources. The article does not present the author's own conclusions on unknown facts. In other words, Katy Dean had a right to publish an article concerning the Frances' side of the lawsuit so long as it accurately reported the Frances' side of the lawsuit. Sergent's disagreement with the Frances' allegations (e.g., that the district did not care about their concerns) is not evidence that Dean's reporting was inaccurate as to its chosen subject matter.

Dean's methods, including the use of "hearsay" statements, are consistent with established and routine journalistic norms. Shine's declaration states that "the concept of 'hearsay' has no application to news reporting."

#### xiii. Discipline, Courtesy and Respect for Authority

UCS has not explained how the complete removal of Dean's article from the

*Arrow* was reasonably related to discipline, courtesy, or respect for authority. (Tr. at 21). In fact, Superintendent Sergent's deposition testimony that publication of Dean's story would not have interfered with the operation of the school, nor would it have prevented the school from performing its normal function and operation supports a finding for the plaintiff.

## C. SUPPRESSION WAS NOT VIEWPOINT NEUTRAL

Recently, in *Hansen v. Ann Arbor Public Schools,* 293 F.Supp.2d 780, 793 (E.D.Mich.2003), Judge Rosen observed that a high school may not suppress speech based on disagreement with its viewpoint and that a non-viewpoint neutral speech regulation trumped the need to undertake a *Hazelwood*/reasonableness inquiry. *Hansen,* 293 F.Supp.2d at 797 ("A school's restriction on speech reasonably related to legitimate pedagogical concerns must still be viewpoint neutral."). *See also Kincaid v. Gibson,* 191 F.3d 719, 727 (6th Cir.1999), *rev'd and remanded on other grounds,* 236 F.3d 342 (6th Cir.2001); citing *Hazelwood,* 484 U.S. at 267, 108 S.Ct. 562; also citing *International Soc'y for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 683, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992) ("If the school did not intentionally create a public forum, then the publication remains a nonpublic forum, and school may impose any reasonable, non-viewpoint-based restriction on student speech exhibited therein.")

In this case, the only reasonable conclusion that can be drawn from all of the evidence is that superintendent Sergent ordered the deletion of Dean's article from the *Arrow* because she disagreed with the Frances' viewpoint as to their lawsuit against Utica Community Schools. Sergent's use of the term "inaccuracies" to describe her criticism of the article simply cannot disguise what is, in substance, a difference of opinion with its content.

At the motion hearing, defense counsel conceded that Dean's article would not have been removed from the *Arrow* if it had explicitly taken the district's side with respect to the Frances' lawsuit against UCS. Defendant's explanation that the article was deleted for legitimate educational purposes such as bias and factual inaccuracy is wholly lacking in credibility in light of the evidence in the record. Based on all of the evidence, the Court finds that there is no reasonable dispute that the defendants' speech regulation in this case was not viewpoint neutral.

## D. DEFENDANT'S PROPOSED "IMPRIMATUR" ANALYSIS IS NOT APPLICABLE

Defendants argue that the proper test for restrictions on student speech is the "imprimatur concept" set forth in *Fleming v. Jefferson County Sch. Dist. R–1,* 298 F.3d 918 (10th Cir.2002). The defendants ask the Court to hold that because the *Arrow* bears the imprimatur of the school district, the district has greater discretion in censoring the paper, and may remove articles if they provoke controversy.

The content of Dean's article clearly did not bear the imprimatur of the school. Rather, Dean's article disclaimed an association with UCS by noting that school officials declined to comment on the underlying lawsuit. No reasonable reader could conclude that UCS, by allowing students to publish the *Arrow,* had endorsed the viewpoints expressed by Joanne and Rey Frances in Dean's article.

More importantly, *Fleming* is flawed to the extent that it would allow school officials to enforce viewpoint-based regulations of school-sponsored speech. *See Hansen v. Ann Arbor Public Schools,* 293 F.Supp.2d 780, 798, n. 23 (E.D.Mich.2003) (Rosen, J.) (Rejecting *Fleming* analysis as

applied to school-sponsored, rather than government speech.).

Even under this standard, censorship must be reasonable. The suppression of Dean's article was not reasonable.

## V. CONCLUSION

In a speech at Dartmouth College on June 14, 1953, Dwight D. Eisenhower said, "Don't join the book burners. Don't think you are going to conceal thoughts by concealing evidence that they ever existed."

Katherine Dean's article for the March 15, 2002 issue of the *Arrow* concerning the Frances' lawsuit against Utica Community Schools should not have been suppressed. Thus, the defendants' suppression of the article was unconstitutional.

For the foregoing reasons, the plaintiff's motion for summary judgment is GRANTED and the defendants' motion for summary judgment is DENIED.

Appendix A

DEPOSITION EXHIBIT

# Arrow

Utica High School

47255 Shelby Rd. Utica, MI 48317 • Volume 72, Issue 5 • March 15, 2002

## Inside stuff...

p.tba

NAHS create soup bowls for charity

p.tba

Wagner sets free throw record

## Fumed residents sue UCS

By Kacy Dean
Sports Co-Editor
Dan Rivera
Photo Editor

* Names have been changed due to pending lawsuit.

While undergoing a routine chest x-ray in preparation for a knee-replacement surgery, doctors found a spot on Utica resident Rick Jones'* lung. The spot on the x-ray was later determined, through a biopsy, to be cancerous.

"My first thought was, this has to be from the exhaust," Rick's wife Linda Jones said.

The Jones live on Burton Drive, a street located directly behind the bus garage.

"I asked the doctor if diesel exhaust could've contributed to the cancer," Linda said. "He said 'I don't know...but, it certainly never helped anyone breathe.'"

Due to Rick's medical concerns, Utica Community Schools is now involved in a lawsuit regarding their bus garage located near 21 Mile and Shelby Road, behind Utica High School's Barney Switnehart field.

School district officials, as well as township officials, refused to comment on the pending lawsuit.

The plaintiffs alledge exhaust from the diesel school buses has contributed to Rick's throat and lung cancer.

Other residents of the surrounding neighborhood have not, as of yet, filled suit or attached to the current lawsuit. However, they also suffer repurcussions, other than cancer, due to the garage's location. Noise and light, along with the prevalent pollution are com-

Please see LAWSUIT, page 3

Caution: Children at play. Willey Elementary's playground is located just feet away from the UCS bus garage. Students play outside each day on the playground during recess.

Must they move? The district has attempted to solve their problems with small solutions, including installing a wooden fence and implementing a 'no idle zone' to reduce exhaust in some areas.

Too close for comfort. "If you don't believe it, you won't believe it," a resident said in reference to the close proximity of the bus garage to the houses.

## New Prom policy may wrinkle plans for some students

Buses in backyard. Several houses off of Burton Drive and other streets backup directly behind the bus garage.

Breathe in. Diesel exhaust from the buses contain hundreds of carcinogens. Exhaust particles are so small, they are taken into the deep portions of the lungs where they remain lodged.

Lots o' buses. Over three hundred diesel powered school buses are stored and started at the bus garage, all of which expel diesel exhaust.

No fumes allowed. Despite the no bike zone, residents claim bus drivers idle the buses in the area, which creates added exhaust.

# LAWSUIT

Continued from page 1

mon complaints of residents who live near the bus garage.

"It's terrible living here," a resident living on Burton said. "It's bad. The exhaust comes directly into the house, through the windows and doors. We're really sick of it. We've had it."

While the plaintiffs are mainly focusing on the cancer aspect of the district's negligence and unwillingness to move their transportation facilities, previous studies had not proven the carcinogenic effects of exposure to diesel exhaust, and the terms of exposure.

New studies do show a correlation between exposure to diesel exhaust and cancer.

An article published in USA Today on March 15, 2000 stated that "toxic chemicals in diesel exhausts from trucks and buses are responsible for at least 125,000 _____ a lifetime," according to a study by a coalition of state and local air pollution control agencies.

According to cancerpage.com, the Environmental Protection Agency (EPA) is currently taking action to reduce pollution from the nation's heavy diesel trucks and buses.

Many residents claim the district has not addressed their concerns, despite letters to city and school officials and numerous phone calls.

"One time we called and said, 'Your exhaust is killing us'," Linda said. "A district employee responded by saying, 'If you think this is bad, we're going to add more buses. You can do whatever you want, but we're not going to do anything.'"

According to Linda, UCS superintendent Joan Sergent visited the Jones' residence, but was not helpful.

"She is the one who authorized this, and is the one who is keeping this going and refusing to do anything," Linda said.

The district purchased a 75 foot lot in 1995 in addition, which angered residents, because the lot backs up directly to their yards; and the issue has been escalating since 1998 when UCS paved over existing gravel and parked school

buses along the fence.

Some residents of the neighborhood signed and delivered a petition directly to Shelby Township city officials. They then learned of the district's autonomy and that the township would be unable to help.

The district can do whatever they want," Linda said, "and if they can do it, they will do it. The city's hands are tied."

The Jones' contacted state representative Alan Sanborn who came to their house. According to Linda, Sanborn said, "I don't believe it, but there's not a thing I can do."

As a legislator, Sanborn cannot be involved in legal issues, according to a member of his staff.

The neighborhood is characterized by its older residents and economically efficient housing. Many residents are long-term inhabitants of the area.

"We are not in any position to move," Linda said. "We're not moving. We were here first.

"They say they're not moving," Linda said, "but why should we have to?"

## Substances in diesel exhaust listed by EPA as toxic air contaminants* include:

| substance | consequence |
|---|---|
| •formaldehyde, acetaldehyde | • cause irritation of eyes, throat, and nose; carcinogenic |
| •toluene, lead, cadmium,mercury | • cause birth defects; mutation of DNA; carcinogenic |
| •dioxins | • toxic to immune system and reproductive system; interfere with hormone function; carcinogenic |

*A toxic air contaminant is defined as an air pollutant which may cause or contribute to an increase in mortality or in serious illness, or which may pose a present or potential hazard to human health.

Source: Environmental Protection Agency

**Appendix B**

Utica High School ARROW

47255 Shelby Rd. Utica, MI 48317 • Volume 72, Issue 5 • March 15, 2002

EXHIBIT
A

## Inside stuff...

**p.6**
NAHS creates soup bowls for charity

**p.28**
Wagner sets free throw record

**p.14**
Tattoos: Worth the pain and health risks?

**p.24**
The twists and folds of origami

# Fumed residents sue UCS

By Katy Dean
Sports Co-Editor
Dan Butts
Photo Editor

While undergoing a routine chest x-ray in preparation for a knee-replacement surgery, doctors found a spot on Utica resident Rey Frances' lung. The spot on the x-ray was later determined, through a biopsy, to be cancerous.

"My first thought was, this has to be from the exhaust," Rey's wife Joanne Frances said.

The Frances live on Burton Drive, a street located directly behind the bus garage.

"I asked the doctor if diesel exhaust could've contributed to the cancer," Joanne said. "He said 'I don't know...but, it certainly never helped anyone breathe.'"

Due to Rey's medical concerns, Utica Community Schools is now involved in a lawsuit regarding their bus garage located near 21 Mile and Shelby Road, behind Utica High School's Barney Swinehart field.

School district officials, as well as township officials, refused to comment on the pending lawsuit.

The plaintiffs allege exhaust from the diesel school buses has contributed to Rey's throat and lung cancer.

As of yet, other residents have not filed suit or attached to the current lawsuit. However, they also suffer repercussions, other than cancer, due to the

Please see LAWSUIT, page 3

Caution: Children at play. Wiley Elementary's playground is located just feet away from the UCS bus garage. Students play outside each day on the playground during recess.

Must they move? The district has attempted to solve their problems with small solutions, including installing a wooden fence and implementing a "no idle zone" to reduce exhaust in some areas.

Too close for comfort. "If you don't see it, you won't believe it," a resident said in reference to the close proximity of the bus garage to the houses.

---

*New Prom policy may wrinkle plans for some students*

# Meeting called for senior females

By Suzanne Hooper
Feature Editor

New Prom dress regulations caused heated discussion amongst students during the mandatory meeting for all senior females on Tuesday, March 5 during second hour.

"It isn't as bad as what we thought it would be because of all the rumors," senior Moe Hannon said. "The dress code is promoting more of a classy look as opposed to a trashier look."

The meeting was headed by Student Activities Director Lisa Lorincz at the request of the school's administration.

"In a perfect world when people disagreed with a policy they would package their complaints in a different way," Lorincz said. "Although, I was extremely impressed with the way the senior class handled the issue overall. We have an extremely talented and blessed graduating class."

Other issues addressed at the meeting were proper dress at school and abolishing Prom Court.

"I wasn't so much upset that they abolished Prom Court and I can even see the reasoning behind the decision," senior Elizabeth Hussey said. "But I am disappointed that nobody decided to discuss it with us before any decision was made. Ideally we would have been able to vote on the

policy."

After numerous complaints from teachers regarding the visibility of female undergarments during the school day, the administration felt it was also an issue that needed to be addressed.

"There is appropriate and inappropriate dress at Utica," Lorincz said, "and being able to see a female's undergarments when she bends over is a distraction in the classroom."

"The idea to start reprimanding students for their thongs hanging out is a good idea," senior Agnes Guzik said. "But they shouldn't be telling just the seniors. The sophomores and juniors are just as guilty as we are."

While many female students will not be affected by the new policy regarding Prom dress, several students were upset about the new rules.

The new policy basically requires that female students cover their midriff and chest during dances. Two piece dresses are still acceptable for Prom. However, females with dresses that do not cover the midriff will not be admitted to Prom.

"I had bought a dress a while ago for Prom that I am no longer able to wear," senior Kristen Yanniello said. "I personally

don't have that big of a problem complying with the new rules. I just have to find a new dress now that does not show my stomach."

Students with excessive cleavage or low-cut dresses will not be permitted entrance into Prom on June 5. Low cut backs and backless dresses are still allowed, provided that they do not cut too low.

"To be truthful, nothing that was said during the meeting in regards to dress was unreasonable," Guzik said.

"However, what about the girls from other schools who come with their dates or the sophomores and juniors who have no idea about any of this?" Guzik said. "Are they going to turn away all those people who have no idea about this as well?"

### PROM DRESS CODE
- Dresses must cover appropriate areas
- Dresses can be backless, but not too low cut in back
- Two piece dresses must meet
- Necklines must cover chest
- Strapless dresses are fine as long as person is covered

Buses in backyard. Several houses off of Burton Drive and other streets backup directly behind the bus garage.

Breathe in. Diesel exhaust from the buses contain hundreds of carcinogens. Exhaust particles are so small, they are taken into the deep portions of the lungs where they remain lodged.

Lots o' buses. Over three hundred diesel powered school buses are stored and maintained at the bus garage, all of which expel diesel exhaust.

No fumes allowed. Despite the no idle zone, residents claim bus drivers idle the buses in the area, which creates added exhaust.

# LAWSUIT

Continued from page 1

garage's location. Noise and light, along with the prevalent pollution are common complaints of residents who live near the bus garage.

"It's terrible living here," Joanne said. "It's bad. The exhaust comes directly into the house, through the windows and doors. We're really sick of it. We've had it."

While the plaintiffs are mainly focusing on the cancer aspect of the case, previous studies had not proven the carcinogenic affects of exposure to diesel exhaust, and the terms of exposure.

New studies do show a correlation between exposure to diesel exhaust and cancer.

An article published in USA Today on March 15, 2000 stated that "toxic chemicals in diesel exhausts from trucks and buses are responsible for at least 125,000 cancers each, over a lifetime," according to a study by a coalition of state and local air pollution control agencies.

According to cancerpage.com, the Environmental Protection Agency (EPA) is currently taking action to reduce pollution from the nation's heavy diesel trucks and buses.

Many residents claim the district has not addressed their concerns, despite letters to city and school officials and numerous phone calls.

"One time we called and said, 'Your exhaust is killing us,'" Joanne said. "A district employee responded by saying, 'If you think this is bad, we're going to add more buses. You can do whatever you want, but we're not going to do anything.'"

According to Joanne, UCS superintendent Joan Sergent visited the Frances' residence, but was not helpful.

"She is the one who authorized this, and is the one who is keeping this going and refusing to do anything," Joanne said.

The district purchased a 75 foot lot in 1995 in addition, which angered residents, because the lot backs up directly to their yards, and the issue has been

escalating since 1998 when UCS paved over existing gravel and parked school buses along the fence.

Some residents of the neighborhood signed and delivered a petition directly to Shelby Township city officials. They then learned of the district's autonomy and that the city would be unable to help.

"The district can do whatever they want," Joanne said, "and if they can do it, they will do it. The city's hands are tied."

The Frances' contacted state representative Alan Sanborn who came to their house.

According to Joanne, Sanborn said, "I don't believe it, but there's not a thing I can do."

Sanborn was endorsed by the Utica Education Association.

The neighborhood is characterized by its older residents and economically efficient housing. Many are long term residents of the area.

"We are not in any position to move," Joanne said. "We're not moving, we were here first."

"They say they're not moving," Joanne said, "but why should we have to?"